IN THE SUPREME COURT OF TENNESSEE
AT MEMPHIS
November 4, 2008 Session

## DEREK DAVIS v.
## SHELBY COUNTY SHERIFF'S DEPARTMENT

**Appeal by permission from the Court of Appeals, Western Section**
**Chancery Court for Shelby County**
**No. CH-3-0295-2  Arnold B. Goldin, Chancellor**

───────────────

**No. W2007-01077-SC-R11-CV - Filed February 20, 2009**

───────────────

The issue in this appeal is whether the Shelby County Civil Service Merit Board had cause to terminate Derek Davis' employment for violating the Department's drug-free workplace program. Upon review, we find that: (1) the Court of Appeals applied the incorrect standard of review in reviewing the Board's decision; (2) the positive urine specimen test result was admissible evidence for the Board to consider; and (3) the Board's decision to terminate Mr. Davis' employment was not arbitrary or capricious and was supported by evidence that is both substantial and material. Accordingly, we reverse the decision of the Court of Appeals and reinstate the trial court's judgment.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of
Appeals Reversed; Judgment of the Trial Court Reinstated**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., and GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Martin W. Zummach, Assistant Shelby County Attorney, for the appellant, Shelby County Sheriff's Department.

William M. Monroe (at trial), Memphis, Tennessee, and Leslie A. Miller (on appeal), Somerville, Tennessee, for the appellee, Derek Davis.

### OPINION

*Factual & Procedural History*

Derek Davis was a patrol officer for the Shelby County Sheriff's Department ("Department"). On or about July 25, 2001, the Department instituted the Drug Free Workplace Program ("Program"). On August 17, 2001, Mr. Davis signed an "Acknowledgment of Receipt of Drug Free Workplace Program - Policy and Procedure" form, acknowledging that he received, read, and

understood the Program's policies and procedures.[1]  As part of the Program, Department employees are randomly chosen to provide urine samples, from which use of illegal drugs can be detected.

On August 20, 2002, Mr. Davis and other Sheriff's deputies were randomly chosen to be drug tested.  That morning, during "roll call," Mr. Davis was informed that he needed to go to "Jail-East at 3 p.m." for a drug screening.  The drug screening was conducted by MedLab, Incorporated ("MedLab").[2]  After arriving at "Jail-East," Mr. Davis testified that he was directed into the lobby, where he noticed Suzanne Renfroe, a human resources officer for the Department, "checking off names."[3]  Mr. Davis informed Ms. Renfroe that he was "here to take a drug test."  She directed him to stand in a line "against the wall."  Mr. Davis testified that he was in uniform during the test and that his name is embroidered on his uniform shirt.

The testimony indicates that the "usual procedure" for drug testing is as follows.[4]  A collector accompanies a donor to the bathroom where a specimen is taken.  The donor is observed supplying the specimen.  After the collector receives the urine specimen cup from the donor, a lid is placed on the cup, and a tamper-proof adhesive label is placed across the top of the lid.  The designations "donor's initials" and "date" appear on the tamper-proof adhesive label.  The donor affixes his or her initials and the date on the label.  Also on the specimen container is a label that contains a bar code and chain of custody number.  The chain of custody number and bar code are used to link the specimen to the donor; specifically the chain of custody number and bar code link the specimen to the donor's paperwork, which contains the identical chain of custody number and bar code.  After the container has been properly labeled and initialed, the container is placed in a sealed bag and prepared for transportation to the laboratory for testing.  On the container at issue in this case, the initials "DD" and the date "8-20" appear on the tamper-proof adhesive label.

In addition to providing a urine sample, Mr. Davis also filled out paperwork.  Either before or after providing a urine sample,[5] Mr. Davis signed a MedLab "chain of custody" document.  In the top left and bottom right corners of the document appears the collection identification number "0312131."  Part one of the document contains the contact person for and location of the Department.  Part two of the document, titled "TO BE COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE," contains: the reason for the drug test – "random"; the type of drug screen – "volume"; and the condition of the drug screen  – "observed."  Additionally, the box "photo I.D."

---

[1] The actual policies and procedures of the Program are not contained in the record.

[2] "MedLab" is the toxicology lab for Methodist Healthcare.

[3] Mr. Davis testified that he had never met Ms. Renfroe before August 20.

[4] MedLab's processes for conducting drug screens were not easily discernible from the record.  Therefore, the "usual procedures" are a patchwork of the sparse record provided.

[5] The Department contends that Mr. Davis signed the document after providing the sample.  The language of the document clearly intends this to be the case.  Mr. Davis, however, argues that he signed the document before giving a urine sample.

is checked after the statement "Donor Identification Verified By:."

Part three of the document, titled "DONOR SECTION," contains the following:

> I authorize the collection of this specimen for the purpose of a drug screen. I acknowledge that the specimen container(s) was/were sealed with tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize to release the results of the test to the company identified on this form or its designated agents.

Beneath this clause are three spaces: one space for "(PRINT) DONOR'S NAME (FIRST, MI, LAST)," one space for "DONOR SS# OR EMP. ID#," and one space for "SIGNATURE OF DONOR." On the document appears Mr. Davis' printed name, his employee identification number, and his signature. Mr. Davis does not dispute that he signed this document. He does dispute, however, that he wrote his printed name and identification number.

Part four of the document is titled "TO BE COMPLETED BY COLLECTOR." In this section appears the name (in print), date, and signature of the collector of the specimen. A second signature of the same collector appears in the same part after the statement "Sealed Specimen, Placed In Security Pouch Immediately After Collection, and Transferred to Courier For Transport To Laboratory By:." The name of the collector, however, is unclear from the record.[6]

Approximately one week after the drug test, on August 26, 2002, a medical review officer from MedLab notified Mr. Davis that his urine specimen tested positive for THC[7] or marijuana. At this time, Mr. Davis requested that his back-up sample be tested.[8] The back-up sample was sent to

---

[6] In the Court of Appeals' opinion, discussion of this issue is addressed this way:

Mr. Davis . . . submits that the testing form which is required to be signed by the collector of the urine sample appears to have been signed by a Michelle Swan, and that Mr. [Gary] Houston[, the MedLab manager,] testified that no one named Michelle Swan was working for [MedLab] in August 2002 and that he did not know a person by that name.

. . .

It appears to us . . . that the form was signed not by a "Michelle Swan," but by a "Michelle Swuni" or "Michelle Seeuni, . . . ."

Davis v. Luttrell, No. W2007-01077-COA-R3-CV, 2007 WL 4374028, at *2-3 (Tenn. Ct. App. Dec. 17, 2007).

[7] Tetrahydrocannabinol ("THC") is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana. Interstate Mech. Contractors, Inc. v. McIntosh, 229 S.W.3d 674, 677 (Tenn. 2007).

[8] At some point in the drug screening process, the urine sample is separated into two different plastic specimen containers: one container to be tested immediately and a second, back-up container to be used if a recheck is requested or needed to verify the results of the first test. It is unclear from the record whether the sample is separated in front of the donor or whether this separation occurs after the sample has been transported to the laboratory for testing. As Mr. Davis has not challenged the means by which the sample was separated or that it was separated incorrectly, it is

a different laboratory, American Medical Laboratories, for testing. This second sample also came back positive.

After being notified of Mr. Davis' positive drug test, the Department relieved Mr. Davis of duty "with pay, pending a review by the ADO."[9] Two days later, on August 28, Mr. Davis had a second, independent test conducted at his own expense. This test came back as neither positive nor negative for THC because the urine had been either intentionally or unintentionally diluted.[10]

On September 10, 2002, an administrative Loudermill[11] (due process) hearing was conducted. David Wing, Chief Inspector for the Department, presided over the hearing. During the hearing, Mr. Wing heard testimony from Ms. Renfroe and Mr. Davis. Mr. Davis asserted that the positive urine specimen was not his. Mr. Davis argued that MedLab erred in labeling his specimen. To support this argument, Mr. Davis testified, "[The collector] gave me a cup, I walked over and peed; handed [the cup] to him and left. I didn't watch anything else after that. I left and went back to work." Mr. Davis asserted that he did not remember initialing "DD" on the specimen container, that he did not read the chain of custody form, and that he signed the chain of custody form before, not after, providing his urine sample. After considering this testimony,[12] Mr. Wing determined that it was Mr. Davis' urine that tested positive for marijuana, and as such, his employment should be terminated for violating the Program's policies. Mr. Davis' employment was terminated effective September 12, 2002. On September 13, 2002, Mr. Davis submitted to another drug test through his second

___

unnecessary for this Court to know when the usual separation procedure occurs.

[9] It is unclear from the record what "ADO" stands for.

[10] Mr. Houston testified: "A diluted specimen means that the specimen has been tested and has been determined to be diluted, whether it's intentional or unintentional. This means that the drugs, if there w[ere] drugs present, [they] could possibly be diluted down to under the cut-off levels to where they're not detected."

[11] The term "Loudermill hearing" derives from the United States Supreme Court decision Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985). The Loudermill Court held that a public employee who can be discharged only for cause must be given notice and an opportunity to respond to the charges against him prior to termination. Loudermill, 470 U.S. at 546.

[12] As set forth in the transcript of Mr. Davis' Loudermill hearing, the standard of proof and rules of evidence applicable to this hearing are as follows:

Standard of Proof - The presumption of innocence applicable in a criminal prosecution is not applicable in an administrative hearing. Nevertheless, in bringing the charges the department has the burden of presenting it's [sic] case prior to the defense stating its case. In order to be upheld on appeal, any disciplinary actions imposed must be supported by at least substantial evidence. The usual standard in criminal cases is that guilt must be proved beyond a reasonable doubt. In an administrative hearing, however, the standard is lower. Preponderance of evidence is the minimal standard in internal cases.

The Rules of Evidence - In general strict adherence to the rules of evidence is not required in an administrative hearing. Therefore, a departmental hearing board is free to consider hearsay evidence and/or expert testimony, and need not require the laying of any foundation for receipt of the evidence.

employer, Kroger Corporation. Mr. Davis "passed" the drug test.[13]

Mr. Davis appealed to the Shelby County Civil Service Merit Board ("Board"). A hearing before the three-member Board was held on December 3, 2002. During the hearing, Mr. Davis again asserted that the positive urine specimen in question was not his. In addition to arguing that he did not remember initialing the tamper-proof adhesive label on the specimen container and did not read the chain of custody form before signing it, Mr. Davis asserted that the chain of custody number located on the container might not match the chain of custody number found on the chain of custody form. Specifically, Mr. Davis asserted that the chain of custody number on his paperwork is 0312131. Concurrently, he asserted that the xerox copy of the label containing the chain of custody number and bar code, entered into evidence during the Board's hearing, did not conclusively show that the chain of custody number was 0312131. Instead, as Mr. Davis argued, the number on the copy could be either "0312121" or "0312131."[14]

When questioned about the xerox copy of the chain of custody number, Gary Houston, the MedLab manager, acknowledged that, given the quality of the copy, the second to last digit could be either a "2" or a "3." He continued: "But, however, you are looking at a copy. You're not looking at the original bottle. You're not looking at the original specimen." Additionally, Chief Wing, who presided over Mr. Davis' Loudermill hearing, testified during the Board's hearing that he examined the actual specimen container, including the chain of custody number, prior to making his recommendation to terminate Mr. Davis' employment.[15]

Mr. Davis further argued that he never presented photo identification when he reported for his drug test. Mr. Davis did agree, however, that his name appeared on the uniform he wore during the test. Finally, Mr. Davis argued that the Department never explained the discrepancy between the fact that Mr. Davis asserted that his collector was a male yet the collector's signature on the chain of custody form appeared to be that of a female, "Michelle Swain or Swan." Mr. Davis argued that, because the Department never presented Ms. Swain or Swan and never identified which MedLab collector actually signed the chain of custody form, there were "serious flaws" with the chain of custody of the positive urine specimen, such that the test result should be inadmissible evidence, and without which the Board would have no evidence to support a decision to terminate Mr. Davis' employment.

On or about December 18, 2003, the Board issued its findings, upholding Chief Wing's

---

[13]On the paperwork used by Kroger and the testing laboratory, it states: "Non-DOT Test result: PASS."

[14]The xerox copy of the label at issue is included in the record. Given the poor quality of the copy, it is impossible to determine whether the second to last digit in the seven-digit chain of custody number is a "2" or a "3."

[15]Importantly, we note that neither party presented evidence concerning a potential alternative owner of the sample in question. Thus nothing in the record identifies to whom, if anyone, the chain of custody number 0312121 was assigned on August 20, 2002. Neither does the record reflect whether anyone else with the initials "DD" was tested on the same day as Mr. Davis.

determination that Mr. Davis' employment should be terminated for violating the Department's drug policies.[16] Mr. Davis appealed to the Chancery Court for Shelby County, filing for a Petition for Writ of Certiorari Statutory Appeal, and Complaint for Deprivation of Civil Rights. A hearing was held on April 6, 2006, and the court ruled orally from the bench. Determining that it was constrained by the standard of review provisions found in Tennessee Code Annotated section 4-5-322(h)(1)-(5), the trial court stated that "[i]f there's any basis on which th[e opinion of the Board] can be upheld . . . then I really feel like my hands are tied." On June 28, 2006, the trial court entered an order denying Mr. Davis' petition, thus affirming the Board's decision.

Mr. Davis filed an appeal to the Court of Appeals on May 17, 2007,[17] arguing, as his sole issue, that the Board's decision to terminate Mr. Davis' employment was not based on substantial and material evidence because the decision was "based upon an inadmissible drug test result." He asserted that the standard of review is that afforded by the common law writ of certiorari. Relying on the same arguments raised in the trial court, Mr. Davis asserted that the Department failed to show the necessary chain of custody that would allow the urine specimen test result to be admissible evidence and thus, that there was no material evidence to support the Board's decision.

In its December 17, 2007, opinion, the Court of Appeals agreed with Mr. Davis as to both the standard of review and the outcome. It determined "that the decision to terminate [Mr. Davis'] employment was arbitrary where the Department was unable to present any evidence to establish that the specimen at issue in this case belonged, in fact, to Mr. Davis." Davis, 2007 WL 4374028, at *4. The Court of Appeals continued:

> We are not insensitive to the chancellor's determination that, to a large extent, the Board's decision was based on a determination of credibility with respect to the "D" initials on the specimen. Additionally, Mr. Davis' contention that he did not read the MedLab form before signing it is not, without more, sufficient to excuse him from its representations. However, the Department's inability to establish that the specimen [chain of custody number] matched the MedLab form signed by Mr. Davis, coupled with the complete absence of any testimony or evidence regarding the procedures followed on August 20 and the unknown identity of the mysterious Michelle Swan or Swani or Swuni or Seeuni, simply renders the [Board's] decision based on the evidence of the record arbitrary.

---

[16]A copy of the Board's findings is not included in the record. In Mr. Davis' petition for writ of certiorari to the Shelby County Chancery Court he asserted, "The Civil Service Merit Board issued a finding on or about December 18, 2002, a copy of which is attached hereto as Exhibit A." "Exhibit A" is also not included in the record on appeal.

[17]On August 19, 2003, Mr. Davis filed a Motion to Amend Complaint in the trial court. The Department responded to this motion on September 3, 2003. The trial court did not address this motion before denying Mr. Davis' petition for writ of certiorari on June 28, 2006. After Mr. Davis filed a notice of appeal to the Court of Appeals, the Court of Appeals dismissed the appeal for failure to appeal a final judgment or order. Subsequently, on April 23, 2007, the trial court entered an order "Reinstating Case for Entry of Order Denying [Mr. Davis'] Motion to Amend." Subsequently, Mr. Davis filed a second notice of appeal to the Court of Appeals on May 17, 2007.

Id. Accordingly, the Court of Appeals reversed the Board and trial court. The Department timely filed an application for permission to appeal to this Court on January 24, 2008, arguing that the Court of Appeals applied an inappropriate standard of review in reversing the Board's decision to terminate.

**Analysis**

*Standard of Review*

We accepted this case primarily to reiterate the applicability of the UAPA standard of review in cases involving the Shelby County Civil Service Merit Board. In its opinion, entered December 17, 2007, the Court of Appeals stated that "[t]he court's review . . . is limited to whether the inferior board or tribunal exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently." Davis, 2007 WL 4374028, at *1 (citing McCallen v. City of Memphis, 786 S.W.2d 633, 640 (Tenn. 1990) (addressing the appropriate standard of review of the Memphis City Counsel's approval of a zoning ordinance)). This standard of review has been defined as "review under the common law writ of certiorari." Tidwell v. City of Memphis, 193 S.W.3d 555, 559-60 (Tenn. 2006). Under common law writ of certiorari review, a board's determination is arbitrary and void if it is unsupported by any material evidence. Watts v. Civil Serv. Bd. for Columbia, 606 S.W.2d 274, 276-77 (Tenn. 1980).

Prior to January 1, 1989, Tennessee Code Annotated section 27-9-114[18] provided, in pertinent part:

> No court of record of this state shall entertain any proceeding involving the civil service status of a county or municipal employee when such proceeding is in the nature of an appeal from a ruling of a city or county official or board which affects the employment status of a county or city employee, except such proceeding be one of common law certiorari.

Accordingly, under this section, review of administrative determinations affecting the employment status of county employees, including Board decisions, would have been under common law writ of certiorari review. See Huddleston v. City of Murfreesboro, 635 S.W.2d 694, 695-96 (Tenn. 1982) (holding that section 27-9-114 is the "exclusive remedy for judicial review of administrative determinations respecting the employment status of such employees").

However, in 1988, the General Assembly amended the language of section 27-9-114 to read, in pertinent part, "Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under Tennessee Code Annotated, Section 4-5-322, of the

---

[18]This section was originally codified as Tennessee Code Annotated section 27-914. See Tenn. Code Ann. § 27-914 (1956).

[UAPA]." 1988 Tenn. Pub. Acts, ch. 1001. Thus, the legislature deleted the provision requiring common law writ of certiorari review and replaced it with the current provision providing for judicial review under the UAPA. See Tenn. Code Ann. § 27-9-114(b)(1) (Supp. 2008). This subsection has not been subsequently amended.

In our view, no doubt should ever have existed that the Shelby County Civil Service Merit Board is just that – a "civil service board." Accordingly, since January 1, 1989, the Board's decisions should have been reviewed in accordance with Tennessee Code Annotated section 4-5-322. In most cases the correct standard of review has been applied. E.g., City of Memphis v. Civil Serv. Comm'n of Memphis, 216 S.W.3d 311, 315-16 (Tenn. 2007); County of Shelby v. Tompkins, 241 S.W.3d 500, 505 (Tenn. Ct. App. 2007); Gleaves v. Shelby County, No. W2007-02259-COA-R3-CV, 2008 WL 4648354, at *5 (Tenn. Ct. App. Oct. 21, 2008); Logan v. Civil Serv. Comm'n of Memphis, No. W2007-00324-COA-R3-CV, 2008 WL 715226, at *5 (Tenn. Ct. App. Mar. 18, 2008); King v. Shelby County Gov't Civil Serv. Merit Bd., No. W2006-02537-COA-R3-CV, 2007 WL 1695404, at *3 (Tenn. Ct. App. June 13, 2007). There have been cases, however, where the intermediate appellate court has reverted to the old common law writ of certiorari review. E.g., Case v. Shelby County Civil Serv. Merit Bd., 98 S.W.3d 167, 172 (Tenn. Ct. App. 2002) (applying common law writ of certiorari review in accordance with Tennessee Code Annotated section 27-8-101); Hollimon v. Shelby County Gov't, No. W2004-01111-COA-R3-CV, 2005 WL 736725, at *2 (Tenn. Ct. App. Mar. 31, 2005) (applying common law writ of certiorari review in accordance with Tennessee Code Annotated section 27-8-101). These cases do not reflect the correct standard of review. We therefore take this opportunity to reiterate that, because the Board's decision "affects the employment status of a county or city civil service employee," judicial review "shall be in conformity with the judicial review standards under . . . § 4-5-322." Tenn. Code Ann. § 27-9-114(b)(1).

In clarifying the application of Tennessee Code Annotated section 27-9-114 to this Board, a final issue needs to be addressed. In Shelby County Sheriff's Dep't v. Lowe, No. W2008-00433-COA-R3-CV, 2008 WL 5191295, at *3 (Tenn. Ct. App. Dec. 11, 2008) (appl. perm. appeal filed, Jan. 21, 2009), the Court of Appeals posed this question: "Whether section 4-5-322 governs judicial review of civil service boards not governed by section 27-9-114(a)(1)"? Although this Court has not previously addressed this issue, upon review we find that section 4-5-322 does apply.

Pursuant to Tennessee Code Annotated section 27-9-114(a)(1) (Supp. 2008):

> Contested case hearings by civil service boards of a county or municipality which affect the employment status of a civil service employee shall be conducted in conformity with contested case procedures under the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3.

In contrast, Tennessee Code Annotated section 27-9-114(a)(2) (Supp. 2008) states:

> The provisions of subdivision (a)(1) pertaining to hearings by civil service

boards shall not apply to municipal utilities boards or civil service boards of counties organized under a home rule charter form of government.

Shelby County is a home rule jurisdiction, and as such, Tennessee Code Annotated Section 27-9-114(a)(2) exempts the Board from the UAPA's contested case hearing procedures. See id. However, reading subsections 27-9-114(a) & (b) *in pari materia*, we do not find that subsection 27-9-114(a)(2) changes or affects judicial review of the Board's decisions under subsection 27-9-114(b)(1), which provides: "Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322." Unlike subsection 27-9-114(a), where the General Assembly clearly expressed its intent to exclude "civil service boards of counties organized under a home rule charter form of government" from compliance with the contested case procedures of the UAPA, the same exclusion does not appear in subsection 27-9-114(b). Therefore, applying the plain and ordinary meaning of Tennessee Code Annotated section 27-9-114(b)(1), this case clearly involves review of a civil service merit board decision which "affects the employment status of a county . . . civil service employee." Accordingly, even though the Board did not have to conduct its hearing "in conformity with [the] contested case procedures under the [UAPA]," id. § 27-9-114(a)(1), the Board's decision must be reviewed "in conformity with the judicial review standards under the [UAPA], § 4-5-322." Id. § 27-9-114(b)(1).

Having determined that the Court of Appeals applied the incorrect standard of review in this case, however, does not resolve all of the issues. Instead, we must address, under the UAPA standard of review, the issue Mr. Davis raised before the Court of Appeals: whether the Board erred in finding that Mr. Davis violated the Department's drug policy when the only evidence presented to support this finding was a contested drug test result? Although our review of the Board's factual findings is confined to the provisions of Tennessee Code Annotated section 4-5-322, our review of matters of law is de novo with no presumption of correctness. Tenn. R. App. P. 13(d); Cumulus Broad. Inc. v. Shim, 226 S.W.3d 366, 373 (Tenn. 2007).

*The Board's Decision to Terminate Mr. Davis*

Through the UAPA, Tennessee Code Annotated section 4-5-322 (2005) provides, in pertinent part:

> (a)(1) A person who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter, which shall be the only available method of judicial review.
>
> . . .
>
> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the

-9-

petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Applying this standard of review, a reviewing court may reverse the Board's decision only if one or more of the five enumerated grounds for reversal is present. Id. § 4-5-322(h). This scope of review is the same for the trial court, intermediate appellate court, and this Court. Gluck v. Civil Serv. Comm'n, 15 S.W.3d 486, 490 (Tenn. Ct. App. 1999).

On appeal, Mr. Davis actually attacks the sufficiency of the evidence relied upon by the Board based on his belief that the positive urine specimen test result is inadmissible. As this Court recently stated in City of Memphis, 216 S.W.3d at 316, "only the last two [statutory grounds for reversal, Tennessee Code Annotated subsections 4-5-322(h)(4)-(5),] relate to the sufficiency of the evidence." Therefore, in order to resolve the issue raised by Mr. Davis, we must determine whether the Board's findings were "(4) [a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted excise of discretion[,] or (5)(A) [u]nsupported by evidence that is both substantial and material in the light of the entire record." Tenn. Code Ann. § 4-5-322(h)(4)-(5). In reviewing the Board's findings, we take into account whatever in the record fairly detracts from the weight of the evidence, but we may not substitute our own judgment on questions of fact by re-weighing the evidence. See id. § 4-5-322(h)(5)(B). We may reject the Board's decision only if a reasonable person would necessarily reach a different conclusion based on the evidence. Martin v. Sizemore, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001). It is not enough that the facts could support a different conclusion. Id.

Mr. Davis contends that the positive urine specimen test result was inadmissible evidence for the Board to consider. Without the test result, Mr. Davis believes the Board had no cause to terminate his employment for violating the Program's policies, thus making the Board's decision "arbitrary and capricious" and "[u]nsupported by evidence that is both substantial and material." Tenn. Code Ann. § 4-5-322(h)(4)-(5). Before this Court, Mr. Davis' attorney agreed, however, that if the Court finds that the positive urine specimen test result was admissible then the Board's decision was neither arbitrary nor capricious and was supported by substantial and material evidence.

Accordingly, if this Court determines that the positive urine specimen test result was admissible, our analysis ends there and the decision of the Board will be affirmed.

*Admissibility of the Positive Urine Specimen Test Result*

Notwithstanding which standard of review the Court of Appeals should have utilized, the real issue in this case is the admissibility of the results of the August 20, 2002, urine test. To support its introduction of the test result, the Department offered: (1) a chain of custody form containing the chain of custody number 0312131; (2) the signature of Mr. Davis certifying that the "specimen container(s) was/were sealed with tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct;" (3) a photocopy of the tamper-proof label, with the initials "DD," that was affixed to the lid of the specimen container; (4) the testimony of Chief Wing that he inspected the label on the specimen container containing the chain of custody number prior to recommending termination; and (5) the positive drug test result. On the other side, Mr. Davis testified that: (1) he did not read the chain of custody document before signing it; (2) he signed the document before he provided a urine specimen; (3) he did not remember writing the initials "DD" on the tamper-proof adhesive label; (4) he did not observe how the specimen was handled after he gave the specimen to the collector; (5) the number that appears on the xerox copy of the label containing the chain of custody number could be either 0312131 or 0312121; and (6) the name of the collector who signed the chain of custody document was unknown. Mr. Davis also offered the results of two other drug tests. One test, taken eight days after the original test, was deemed inconclusive because of dilution of the sample. The second test, taken twenty-four days after the original test, showed that Mr. Davis "passed" a non-DOT drug screen.

After considering the testimony of Mr. Davis, Mr. Houston, and Chief Wing, and the exhibits presented, the Board determined that Mr. Davis was fired for cause in accordance with the Civil Service Merit Act.[19] Given that Mr. Davis' testimony directly conflicted with the evidence presented by the Department, the Board clearly resolved issues of credibility against Mr. Davis. Issues of credibility are for the trier of fact, and this Court must give considerable deference to the trier of fact's factual findings. Seals v. England/Corsair Upholstery Mfg. Co., 984 S.W.2d 912, 915 (Tenn. 1999).

Mr. Davis, however, argues that the issue before the Board was not one of credibility, but instead, one of admissibility of evidence. As Mr. Davis argues, the chain of custody of the urine specimen is "so inherently flawed as to render the test results inadmissible." Mr. Davis argues that had the Board correctly applied the rules of evidence and the general rules regarding the admissibility of evidence, the urine specimen test result would have been deemed inadmissible.

As support for his argument, Mr. Davis relies upon the legal principles set forth in

_____

[19] One of the express provisions of the Civil Service Merit Act is that employees may only be terminated for just cause. 1971 Tenn. Priv. Acts ch. 110, § 22.

Tennessee's Rules of Evidence relevant to the admission of physical evidence. See Tenn. R. Evid. 901. Strict adherence to the Tennessee Rules of Evidence, however, is not required in proceedings before the Board. By their own terms, the Tennessee Rules of Evidence do not apply to administrative hearings, but rather to court appearances. Tenn. R. Evid. 101 ("These rules shall govern evidence rulings in all trial courts of Tennessee except as otherwise provided by statute or rules of the Supreme Court of Tennessee."). Therefore, the Tennessee Rules of Evidence do not apply unless the Board enacted a rule to adopt them. See Goodwin v. Metro. Bd. of Health, 656 S.W.2d 383, 388 (Tenn. Ct. App. 1983) ("[N]either the technicalities of the Civil Rules of Procedure nor the common law[20] rules of evidence necessarily apply before nonjudicial bodies *unless the rules of that body so require*.") (emphasis added) (citing Big Fork Mining Co. v. Tenn. Water Quality Control Bd., 620 S.W.2d 515 (Tenn. Ct. App. 1981); L & N Railroad Co. v. Fowler, 271 S.W.2d 188 (Tenn. 1954)). In this instance, the Civil Service Merit Act does not provide that Board hearings are subject to the Tennessee Rules of Evidence.[21] 1971 Tenn. Priv. Acts, ch. 110, § 23. Accordingly, in reviewing decisions from these "less than legally formal hearings," appellate courts are guided, not by the Rules of Evidence, but instead "by a sense of fair play and the avoidance of undue prejudice to either side of the controversy and [must determine] whether . . . the action of the hearing Board in admitting or excluding evidence was unreasonable or arbitrary." Goodwin, 656 S.W.2d at 388.

In this case, Mr. Davis was provided the opportunity to attack the positive test result and to proffer evidence supporting his argument that the sample was not his and that he did not have marijuana in his system at the time the test was administered. The Board, however, did not find Mr. Davis' argument credible and admitted the sample. We cannot say that the admission of the sample was unduly prejudicial, unreasonable, or arbitrary.

Even if the Tennessee Rules of Evidence were applicable during the Board's hearing, we find the necessary chain of custody was sufficiently, if minimally, established to justify admission of the positive urine specimen. "The chain of evidence method of identification is a widely recognized concept in both civil and criminal law." Shell v. Law, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996) (quoting Ritter v. State, 462 S.W.2d 247, 249 (Tenn. Crim. App. 1970)). "In most cases it is not possible to establish the identity of an exhibit in question by a single witness. Several persons have usually handled the specimen before its analysis." Ritter, 462 S.W.2d at 249 (citing

---

[20]The Tennessee Rules of Evidence "were ratified and approved in 1989 House Resolution 10 and Senate Resolution 4" and became effective January 1, 1990. Tenn. R. Evid. Compiler's Notes.

[21]1971 Tenn. Priv. Acts, ch. 110, § 23 ("The board shall . . . commence a hearing thereon and shall thereupon fully hear and determine the matter and shall either affirm, modify, or revoke such order of discipline. The appellant shall be entitled to appear personally, produce evidence, and to have counsel and to a public hearing."). Cf. Metropolitan Government of Nashville & Davidson County, Tennessee, Civil Service Commission, Civil Service Policies, Policy 6.8A-1(L) Disciplinary & Grievance Appeal Proceedings, 88, available at http://www.nashville.gov/civil_service/civil_ service_policies.pdf (explicitly stating what standards for admissibility apply in hearings before the Davidson County Civil Service Commission) ("At all contested case hearings, the testimony of witnesses shall be taken in open hearings. At the discretion of the Commission, or at the motion of any party, witnesses may be excluded prior to their testimony. The standard for admissibility is set forth in T.C.A. 4-5-313.").

21 A.L.R.2d 1216; 29 Am. Jur. 2d Evid. § 830; 32 C.J.S. Evid. § 588(2)). Specimens "should be handled with the greatest of care and all persons who handle the specimen should be ready to identify it and testify to its custody and unchanged condition." Shell, 935 S.W.2d at 409. Whether the requisite chain of custody has been established to justify admission, however, is "a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof." Id.; see Woods v. Metro. Gov't of Nashville & Davidson County, No. M2001-03143-COA-R3-CV, 2003 WL 22938947, at *3 (Tenn. Ct. App. Dec. 10, 2003). "The identity of [the] . . . sample [] need not be proved beyond all possibility of doubt or that all possibility of tampering with [it] be excluded. The circumstances need only establish reasonable assurance of the identity of the sample." Shell, 935 S.W.2d at 409 (quoting Patterson v. State, 160 S.E.2d 815 (Ga. 1968)).

In this case, we find that the facts reasonably establish that Mr. Davis supplied the positive urine specimen. Although the collector of the specimen did not testify, this is not enough to render the evidence incompetent. See Shell, 935 S.W.2d at 409-10 (noting that "the failure to have the phlebotomist available to testify did not render the evidence incompetent" and that "the circumstances under which the samples were taken and the tests conducted[] are matters affecting the credibility of the evidence rather than the admissibility"). Mr. Houston provided testimony regarding the chain of custody number, the bar code, and the chain of custody form signed by Mr. Davis. The chain of custody form contained the signatures of the three individuals who handled the specimen once it arrived at the toxicology lab; one of those individuals being Mr. Houston.[22] Moreover, notwithstanding his later attempt to disavow his actions, Mr. Davis signed the chain of custody form verifying the procedures used during the drug test and acknowledging that the chain of custody number on the sample and the form were identical. Based on these facts, the Board had a reasonable assurance that the positive urine sampled belonged to Mr. Davis, and as such, the Board, in its discretion, determined that the positive urine sample was admissible. We find no error in this determination.

Having determined that the positive urine specimen test result was admissible evidence in the Board's hearing, the Board's decision to terminate Mr. Davis' employment was supported by substantial and material evidence and was neither arbitrary nor capricious. Accordingly, we reinstate the trial court's decision to deny Mr. Davis' Petition for Writ of Certiorari.

---

[22]On the bottom of the chain of custody form, in a section designated, "FOR LAB USE ONLY," appears the signature of the lab technician who "Received In Toxicology from Courier, Removed From Pouch And Placed in Locked Room Temp. Storage By:." Additionally, on the back of the form appears the signatures of two additional "Lab Associates" who handled the positive urine specimen. With each signature appears the "Reason For Handling" and a space for "Date/Time."

**CONCLUSION**

For the reasons stated above, the judgment of the Court of Appeals is reversed, and the judgment of the trial court is reinstated in all respects.  Costs of this appeal are taxed to Derek Davis for which execution may issue if necessary.


                                      _____

                                      CORNELIA A. CLARK, JUSTICE