IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 25, 2012 at Knoxville

**STATE OF TENNESSEE v. MAURICIO MORALES**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3011     Monte Watkins, Judge**

_____

**No. M2010-01236-CCA-R3-CD - Filed August 29, 2012**
_____

The defendant, Mauricio Morales, appeals his Davidson County Criminal Court jury convictions of three counts of rape of a child, one count of aggravated sexual battery, and one count of aggravated burglary, claiming that the evidence was insufficient to support his convictions, that the trial court erred by admitting certain evidence, that the trial court erred in its instructions to the jury, and that the 100-year effective sentence is excessive. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Ashley Preston (on appeal) and Joseph Davidow (at trial), Nashville, Tennessee, for the appellant, Mauricio Morales.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Roger Moore and Sharon Reddick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A Davidson County Criminal Court jury convicted the defendant of three counts of rape of a child, one count of aggravated sexual battery, and one count of aggravated burglary for breaking into the home of Lenae Burton and sexually assaulting her 10-year-old

daughter, N.W.[1]

At trial, N.W. testified that she was born on July 17, 1998, and that in April 2009 she lived with her mother, Lenae Burton, in a Nashville townhouse. The victim testified that at that time, she took a dance class after school and that her team had been practicing for a show to take place in April 2009. The night before the big show, she had fallen asleep in her bedroom while watching "Sponge Bob Square Pants." She said that she awoke sometime between 3:30 and 4:30 a.m. and "saw a man staring down at [her] and then he was holding [her] pink leggings and [her] white sweatshirt." When she tried to get up, the man "ran to the bed" and "put his hand over [her] mouth." The man, whom she had never seen before that night, removed his clothes and then removed the victim's clothes. The victim testified, "And then he started to get on top of me and do things to me that I did not like."

The victim testified that although it was dark outside, she was able to see the man because her bedside lamp was on. The victim said the man told her to be quiet. Despite this warning, the victim said that she tried to scream to wake her mother, but the man put his hand over her mouth again. She said that she had difficulty breathing because the man was on top of her and "was really heavy." The man then "put his private part to [her]" private part, which "kind of hurt." She said that he "kept forcing it" until his private part went inside hers.

The victim testified that the man tried to force his private part into her mouth, but it did not go inside her mouth. She said that he then "tried to like push it in." She said that the defendant also "kept licking [her] all over," including her private part. She testified that he tried to make her grab his private part, but she refused. He then forced her to rub his penis. She said, "He just kept bring[ing] it back and forth with my hand and I let go." The victim recalled that the defendant eventually ejaculated while "grabbing his private part" and "making noises." The first time, the ejaculate "went on the ground," and the second time, "it went on [her] chest." The man told her that his name was Alexander, and when she asked if he believed in God, he said, "No." She said that she cried during the entire encounter and that her "private part, that was all that hurt, and between my legs." The man told her that he knew her mother and that her mother had told him to rape her. The victim said that when she told the man that her grandparents would be there in 15 minutes, "he told [her] 15 more minutes and then he finally got off [her] and he put his clothes on . . . . and he opened [the] door, he put the clothes on [her] and he told [her] to go to bed." She thought he had gone into her mother's room, so she did not move.

---

[1]As is the policy of this court, we refer to the minor victim only by her initials.

The victim identified the parts of the body she meant when saying "private parts" on a drawing. She said the man was wearing "a button down white shirt and jeans and some black and white kind of sport shoes, soccer shoes and under that he had a soccer jersey and soccer shorts." She "told the police that he was Hispanic and he had black hair and he had a small like thin mustache and thin eye brows." The victim recalled that the man spoke with a Spanish accent and that he "smelled like liquor and like some kind of peach fruit." She identified the defendant in court as her attacker.

The victim testified that when her mother got up the following morning, she got up and asked her mother who "Alexander" was. When her mother said, "Who?," the victim told her that a man named Alexander "came in [her] room and he took off all [her] clothes and raped [her]." Her mother first told her that she probably just had a nightmare and that she should get ready for the dance show. The victim said that her mother thought she had had a nightmare because she had been having recurring nightmares since being sexually abused two years earlier. She said that the perpetrator of the earlier offenses had been charged and had pleaded guilty. The victim said that she did as her mother told her, and then they went to the dance show.

She spent that night with her father, and she told him what had happened the night before. The following morning, her father took her back to her mother's house, and a police officer came to talk to her. She then went to the hospital, where she got "a check up and shots."

The victim's mother, Lenae Burton, testified that in April 2009 she lived in a two bedroom townhouse in Nashville with the victim. Both she and the victim went to bed on Friday April 24, 2009, at approximately 10:00 p.m. with their respective televisions on, as was their habit. She said that she checked to make sure that the front and patio doors were locked before going to bed.

The next morning, the victim came to her "and she looked frantic and she said, mom, there was some man in my room last night. He said that he knew you and it was a man in my room and he got on top of me." She said that she asked the victim if she had had a nightmare. She looked around the house, and noticed for the first time that she had failed to close the first floor windows that she had cracked to take advantage of the breeze the night before. Nothing in the house appeared to have been disturbed, so she assumed that the victim had had a nightmare about the previous sexual abuse.

Ms. Burton testified that they got ready and went to the dance show. After the performance, the victim left to go with her father but expressed concern that her mother was returning to their residence alone. Because of the victim's concern, Ms. Burton decided to

-3-

investigate further when she returned home. She soon discovered that the screen was missing from the window on the first floor. She said she found the screen "on the other side of the house folded up." She said that the victim's bedroom was the first at the top of the stairs and that her door bore a picture of the victim.

When she discovered the missing screen, she called police. An officer came to make an initial report, and more officers came on the following day to speak to the victim. Ms. Burton called the victim's father, Booker Warren, and told him what had happened. He expressed concern that she not be in the home alone, so he arranged for someone to come to his house to stay with the victim, who was already asleep, and he went to Ms. Burton's home. Ms. Burton said that during the night, Mr. Warren, who slept on the couch, called her to come downstairs and told her to call police while he went outside to investigate a suspicious noise. At that point, Ms. Burton saw that a screen on a window on the back side of her townhouse had been ripped. She said that that screen was not ripped when she examined the exterior of the home earlier in the day. Around that same time, Mr. Warren saw a man on the back patio.

The next morning, Ms. Burton placed all of the victim's clothing and bedding into a bag. At the direction of police, she took the victim to the hospital for an examination. She agreed to have the victim treated with "HIV preventative drugs." She said that she did not give the defendant permission to enter her home.

During cross-examination, Ms. Burton acknowledged that she waited several hours to contact police, saying she had to "process" the information. She said that she closed the first floor windows before going to the dance show, but she did not notice the missing screen until she checked the perimeter of the home when she returned that afternoon. She did not thoroughly examine the victim's body that morning and just looked for obvious injuries. She conceded that she did not directly hand the bagged items to police but left them in the victim's room for the police to take while she went to the hospital with the victim. She did not give the items to Mr. Warren.

During redirect examination, she said that when she found the bent screen on the ground, she "opened the screen to see if that was the screen for [her] window." She then brought the screen inside.

The victim's father, Booker Warren, testified that the victim first told him that something had happened after they returned to his home following her dance competition. He said that she became distraught when he wanted to leave to get food, and when he asked what was wrong, "she said she had, she thinks she had a dream, but she don't think it was a dream. She said a bad dream, but she don't think it was [a] dream." He took her into another

room for privacy, and she told him that a man had come into her room, "kind of talked to her, told her her mom said it was okay. Said he told her to do some, do certain things to him and . . . . then she used the words, he went inside me." He telephoned the victim's mother and then asked his sister, who lived nearby, to come stay with the victim while he went to Ms. Burton's home.

Mr. Warren testified that he decided to stay the night with Ms. Burton after she told him she had found the front window screen gone. He said that he slept on the couch, which gave him a view through the back door of Ms. Burton's home. As he slept, he heard a whistling noise. He also heard a tapping noise and saw a person "[i]n the middle of the sliding doors." He raised himself from the couch, located his cellular telephone and pocket knife, and then "raised up and whoever the individual was . . . took off." He said that the individual was a short man wearing "a wife beater" and with "[c]urls and like a, maybe a Mexican or white complexion with either a good tan or dirty." He said that the defendant appeared to be the same height as the individual that he had seen but that the defendant's shoulders appeared bigger than those of the man. He said that it appeared to him that the man went toward a neighboring apartment complex.

Metropolitan Nashville Police Department ("Metro") Officer Melissa Johnson testified that she interviewed Ms. Burton and Mr. Warren on April 26, 2009. Based upon the information she collected, the suspect Mr. Warren saw went toward the Turtle Creek apartment complex, which she described as a 10 to 15 minute walk from the victim's residence. She said that a chain link fence separated the properties, but "as long as the apartments have been there, . . . there [have been] holes in the fences that have been cut through." Following her interview, she contacted the crime scene investigation unit to come to the scene.

During cross-examination, Officer Johnson testified that the majority of those living in the Turtle Creek apartments were Hispanic. She was present when the crime scene investigator took the items that had already been bagged by Ms. Burton into evidence.

Pediatric Nurse Practitioner Sue Ross testified that she performed a forensic pediatric examination on the victim. She said that the victim's "anogenital" examination "revealed a couple of very mild injuries," which she described as "a couple of petechia right at the urethral opening" and "an abrasion slash petechial lesion on the hymen." She said that the injuries were "consistent with penetrating injury." Ms. Ross performed a "rape kit" on the victim and suggested to Ms. Burton that the victim begin prophylactic treatment for HIV infection.

Metro Officer Tim Matthews, a member of the identification section

-5-

responsible for the collection and documentation of evidence, testified that when he arrived on the scene to collect the evidence in this case, Mr. Warren was the only person present. Officer Matthews photographed the scene and collected the screen and items bagged by Ms. Burton. He took fingerprints from the screen, but examination revealed that they belonged to Ms. Burton. Officer Matthews testified that Mr. Warren showed him two white garbage bags. He said that Mr. Warren told him that "one bag contained his daughter's clothing that she was wearing at the time of the assault and one bag contained sheets from her bed that she was on when the assault occurred." Officer Matthews said that he tagged the bags but did not inventory them. He turned the evidence into the property room "for safe keeping." He did not go into the victim's bedroom.

Metro Detective David Elliot testified that he met the victim and Ms. Burton at the hospital and spoke with Ms. Burton at that time. He arranged for the victim to be interviewed later. He then took the rape kit from Ms. Ross after it was completed and placed it into the property room in a locker because no officer was on duty.

Davidson County District Attorney's Office Investigator David Zoccola testified that he obtained a search warrant to take swabs of the defendant's cheeks for deoxyribonucleic acid ("DNA") testing. He then located the defendant in Nashville and obtained the swabs by opening the sterile package and having the defendant swab the inside of his cheeks. The defendant then placed the swabs inside a sterile envelope.

Metro Detective Brian Doersam testified that he took the envelope containing the cheek swabs from the defendant to the Tennessee Bureau of Investigation ("TBI") for testing.

Metro Detective Jeff Wiser testified that he knew the victim because he "had investigated a case in '07 that was a fondling case that she had disclosed." That case was resolved by guilty plea. Detective Wiser said that he took the bags containing the items collected by Ms. Burton to the TBI for testing. In addition, Detective Wiser interviewed the defendant, and the defendant told him that in April 2009 he was living in the Turtle Creek Apartments.

TBI Special Agent and Forensic Scientist Brandley Everett testified that he created a DNA profile using the swabs from the defendant's cheek.

Former TBI Special Agent and Forensic Scientist Laura Lee Staples testified that she examined the contents of the rape kit performed on the victim and created a DNA profile using the known sample, in this case the victim's blood. Ms. Staples did not find the presence of semen on the victim's labial swabs but did find evidence indicative of the

presence of saliva. She said that she examined the items contained in the bags prepared by Ms. Burton with the exception of the mattress pad. The clothing was negative for the presence of semen, but Ms. Staples found semen on "a couple of areas" on the victim's sheet" and tested "two separate areas on separate ends of the sheet." She was able to obtain a DNA profile from the sperm that she isolated on the cuttings. That profile matched the defendant.

At the conclusion of this proof, the State read the following election of offenses to the jury:

> Count one, rape of a child, refers to the testimony that the Defendant penetrated [N.W.'s] genitals with his penis.
> Count two, rape of a child, refers to the testimony that the Defendant made [N.W.] perform fellatio on him.
> Count three, rape of a child, refers to the testimony that the Defendant cunnilingus on [N.W.].
> Count four, aggravated sexual battery, refers to proof that the Defendant required [N.W.] to touch his penis.

The State rested, and based upon the proof presented, the jury convicted the defendant as charged of three counts of rape of a child, one count of aggravated sexual battery, and one count of aggravated burglary.

Following a sentencing hearing, the trial court imposed sentences of 30 years for each conviction of rape of a child, 10 years for the conviction of aggravated sexual battery, and four and a half years for the conviction of aggravated burglary. The court ordered the convictions of child rape and aggravated sexual battery to be served consecutively, for a total effective sentence of 100 years' incarceration. By operation of law, the release eligibility on the 100-year sentence is 100 percent. *See* T.C.A. § 39-13-523(b) ("Notwithstanding any other law to the contrary, a child sexual predator, multiple rapist or a child rapist shall be required to serve the entire sentence imposed by the court undiminished by any sentence reduction credits the person may be eligible for or earn."); § 40-35-501(i)(1), (i)(2)(H) ("There shall be no release eligibility for a person committing [aggravated sexual battery] . . . . The person shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained.").

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, he challenges the sufficiency of the convicting evidence, the admission of DNA evidence, the jury instructions provided to the jury, and the sentence imposed by the trial court.

-7-

## I. Sufficiency

The defendant first asserts that the evidence was insufficient to support his convictions. He concedes that the DNA evidence tied the defendant to the crimes, but he claims that he "strongly challenge[s]" the DNA evidence and that "[w]ithout the suspect DNA evidence there is only tenuous evidence connecting" him to the offenses. The State contends that the evidence supports the convictions.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

Aggravated sexual battery, as relevant to this case, is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* §

39-13-501(2).

"Aggravated burglary is burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." *Id.* § 39-13-403(a). Burglary, as is applicable in this case, is committed when a person "without the effective consent of the property owner . . . [e]nters a building . . . with the intent to commit a felony." *Id.* § 39-14-402(a)(1).

The evidence adduced at trial overwhelmingly supports each of the defendant's five convictions. The victim testified that a man she did not know came into her room and forced her to perform various sexual acts. He penetrated her vagina with his penis and tongue and forced her to perform fellatio on him. Forensic DNA testing established beyond a reasonable doubt that the defendant was the perpetrator. That the defendant challenges the admissibility of the DNA evidence is irrelevant to our consideration of the sufficiency of the evidence. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981) (holding that even inadmissible evidence goes into a calculation of the sufficiency of the evidence). The victim's mother testified that a screen was missing from her front window and that the defendant did not have permission to enter her home. The defendant is not entitled to relief on this issue.

## II. DNA Evidence

The defendant challenges the admission of the DNA evidence, claiming that the State failed to establish a complete chain of custody. In a related claim, he asserts that the admission of the DNA evidence violated his right to confront the witnesses against him.

### A. Chain of Custody

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof.'" *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Although "it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody,'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33

S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *id.* The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

In this case, the record establishes that cheek swabs were taken from the defendant while he was incarcerated and that the swabs were sent to the TBI, where the DNA contained on the swabs was used to prepare a DNA profile for the defendant. The victim's mother testified that she bagged the victim's bedding after telephoning police, and other witness testimony established that the bedding was transported first to the Metro property room and then to the TBI for forensic testing. The DNA profile created from semen on cutting's from the victim's bed sheets matched exactly the profile created from the cheek swabs taken from the defendant. We perceive no gap in the chain of custody that might call into question the integrity of this evidence.

## B. Confrontation

In a somewhat confusing argument, the defendant contends that "the chain of evidence that led to the cheek swabs of [the defendant] began not with the cheek swabs themselves, but rather with a CODIS database hit on [the defendant] out of the state of Texas and the subsequent certificate issued by Texas."[2] He then claims that because such a certificate is inadmissible as violative of his confrontation rights, the chain of custody becomes somehow insufficient.

In our view, the defendant has failed to preserve this issue for appellate review. Although the defendant lodged a contemporaneous objection to the admission of DNA evidence linking the defendant to the crimes on the same basis as that raised on appeal, asserting that the defendant was only developed as a suspect on the basis of the CODIS "hit," there is no proof in the record to support this assertion. In addition, the CODIS report is not included in the record. Under these circumstances, review of this issue is impossible.

Moreover, we fail to see how the admissibility of the CODIS report bears upon the chain of custody established by the State. It does not matter to the chain of custody how the defendant was developed as a suspect. The fact is that he became a suspect, and

---

[2]"CODIS is the acronym for the 'Combined DNA Index System' and is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases." Federal Bureau of Investigation, CODIS and DNA Factsheet, http://www.fbi.gov/about-us/lab/codis/codis-and-ndis-fact-sheet.

subsequent DNA testing established his culpability as the perpetrator. Additionally, the State did not seek to admit any information that was violative of the defendant's constitutional rights.

### III. Jury Instructions

The defendant next contends that the trial court erred by providing the definitions of fellatio and cunnilingus in its instructions to the jury because they "were misleading to the jury, and contributed to confusing the jury with regard to the elements of penetration." The State asserts that the instructions were appropriate.

An accused's constitutional right to trial by jury, *see* U.S. Const. amend VI; Tenn. Const. art. 1, § 6, encompasses a right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see Teel*, 793 S.W.2d at 249; *see also* Tenn. R. Crim. P. 30.

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

The trial court provided the following definitions in its instructions to the jury regarding unlawful sexual penetration:

> Cunnilingus means a sex act accomplished by placing the mouth or tongue on or in the vagina or female genitalia of another.

> Fellatio means a sex act accomplished with the male sex organ and the mouth or lips of another. Intrusion into the alleged victim's mouth is not required.

Although the defendant complains that the instructions were misleading, he does not support his argument with citation to any authority that would indicate that the instructions given were incorrect. The definitions were a correct statement of the law, *see, e.g.*, *State v. Marcum*, 109 S.W.3d 300, 304 (Tenn. 2003), and, as such, the defendant cannot be heard to complain.

*IV. Sentencing*

The defendant complains that the trial court erred by imposing an enhanced sentence in the absence of a notice seeking enhanced punishment filed by the State and that the trial court erred by imposing consecutive sentences. The State contends that the defendant did not receive an enhanced sentence for which notice was required and that the record supports the imposition of consecutive sentences.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave due consideration to the appropriate factors and principles which are relevant to sentencing under the Act, and "that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Since the 2005 revisions to our sentencing act rendered enhancement and mitigating factors advisory, appellate review does not extend to the weight afforded mitigating and enhancement factors by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the

-12-

mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

*A. Notice Seeking Enhanced Punishment*

Code section 40-35-202 provides:

If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement, which shall not be made known to the jury determining the guilt or innocence of the defendant on the primary offense, must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions. The original or certified copy of the court record of any prior felony conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named in the record is the same as the defendant before the court, and is prima facie evidence of the facts set out in the record.

T.C.A. § 40-35-202(a).

The record clearly establishes that the State did not file a notice seeking enhanced punishment because it was not seeking enhanced punishment. Furthermore, the

defendant did not receive enhanced punishment and was given a Range I sentence on each count. The defendant is not entitled to relief on this issue.

## *B. Consecutive Sentencing*

The defendant contends that the trial court erred by imposing consecutive sentences because the court was "not detailed in its specific findings regarding why it imposed consecutive sentences on every count." This issue is completely without merit. The trial court meticulously detailed the reasons for imposing consecutive sentences, that the defendant stood convicted of four sexual offenses against the minor victim, specifically finding that consecutive sentences were reasonably related to the severity of the offenses and necessary to protect society from the defendant, whom the court found to be a dangerous offender.

The record supports the imposition of consecutive sentences on the basis of the defendant's being convicted of three child rapes and one aggravated sexual battery against the same minor victim. *See* T.C.A. § 40-35-115(b)(5) ("The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]").

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE