IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2020 Session

## KENNETH WASHINGTON v. CITY OF MEMPHIS CIVIL SERVICE COMMISSION

**Appeal from the Chancery Court for Shelby County**
**No. CH-19-0592     Jim Kyle, Chancellor**

_____

**No. W2020-00185-COA-R3-CV**
_____

This appeal arises from a petition for judicial review of a decision of the City of Memphis Civil Service Commission. The appellant was terminated from his employment with the City after he was found to have violated two sections of the city's disciplinary policy. The Civil Service Commission upheld his termination. The appellant then sought judicial review in chancery court. After reviewing the record, the chancery court likewise upheld termination. The appellant appealed to this Court. Discerning no error, we affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

Herman Morris, Jr., Memphis, Tennessee, for the appellant, Kenneth Washington.

Dennis P. Hawkins, Senior Assistant City Attorney, Memphis, Tennessee, for the appellee, City of Memphis.

## OPINION

### I.     FACTS & PROCEDURAL HISTORY

Kenneth Washington began his employment with the City of Memphis Code Enforcement Department in 2009. Washington was employed as a "code inspector officer." He was terminated in 2017 based on his behavior at an apartment complex within

his district called Washington Manor Apartments. This was a very large apartment complex that had sustained fire damage and had multiple code violations. Washington went to the complex and met with regional property manager Teashea Lloyd. He also met with other individuals at the apartment complex on other occasions. Washington's direct supervisor, Eddie Jones ("Supervisor Jones"), visited the complex as well. Ms. Lloyd complained to the Code Enforcement Department about what she perceived to be inconsistent instructions from Washington. As a result, Supervisor Jones spoke with Ms. Lloyd about the situation. According to Supervisor Jones, Ms. Lloyd informed him, during this conversation, that Washington "was offering himself up" to do the necessary work at the property. Supervisor Jones asked Ms. Lloyd to put her complaint in writing. Ms. Lloyd then sent a formal letter of complaint to Supervisor Jones describing her experience with Washington and his interaction with other members of the staff at Washington Manor Apartments.

Upon receipt of the letter, Supervisor Jones initiated an investigation into the matter. He notified Washington and his union representatives about the complaint that had been lodged and that there was going to be an investigation. Supervisor Jones went back to the apartment complex and spoke with three members of the management team and obtained statements from them. He also spoke with a member of the maintenance staff. Supervisor Jones allowed the union representative to interview those witnesses as well. After considering all of the facts he obtained during his investigation, Supervisor Jones issued a notice of charges to Washington alleging that he had violated two sections of the City's personnel policy entitled "Grounds for Disciplinary Action." Those sections provide that disciplinary action may be taken when:

> 6. The employee has solicited and/or taken a bribe, a fee, a favor, or a gift in the course of work, or in the connection [sic] with work.
> . . .
> 17. The employee has either on or off the employee's regular duty hours engaged in employment activities, or enterprises that are inconsistent, incompatible, or in legal, technical, or moral conflict with the employee's assigned duties, functions, and responsibilities.

Pursuant to the policies and procedures employed by the City's Department of Public Works, Supervisor Jones and another supervisor then conducted a "fact-finding hearing" on the matter. Washington was present with his union representative. He was asked and answered several questions about the incident. He denied that he solicited construction work from the apartment manager or any other employee. However, he admitted that, while on duty at the apartment complex, he gave a personal business card to someone at the property indicating that he was a general contractor. Washington was also given the opportunity to submit any additional statements or evidence to refute the allegations, but he had none.

Supervisor Jones prepared a written summary of the fact-finding hearing and submitted it along with all of the other relevant paperwork to "upper management" for the ultimate decision. One week later, Washington received a document entitled "Hearing Summary and Decision," which described his statements from the fact-finding hearing, the policies he was found to have violated, and the ultimate decision of management. This Summary stated that it was "clear from a preponderance of the evidence" that Washington violated Paragraphs 6 and 17 of the City's personnel policy. The document also stated that his answers during the fact-finding hearing demonstrated "a lack of honesty and integrity" and that he failed to refute the charges against him. It stated that his "inconsisten[t] answers" made it "clear that you gave your contractor business card with the intentions of financial gains to an employee (unnamed male) of the Washington Manor apartments[.]" As for the discipline to be imposed, the Summary noted that Washington's disciplinary history included "multiple major infractions," including three suspensions for a total of 48 days. It also noted that he had "consistently underperformed" in his job duties and responsibilities. As such, the Summary notified Washington that the appropriate discipline was determined to be termination of his employment, effective immediately.

Washington sought an appeal before the City of Memphis Civil Service Commission ("the Commission").[1] A hearing was held before a civil service commissioner on February 12, 2018. The commissioner heard testimony from Washington, Supervisor Jones, Ms. Lloyd (the apartment complex manager who complained), and a former manager of the same apartment complex. Ms. Lloyd testified that she had been working in property management for about eighteen years, but she had only been managing the Washington Manor apartment complex since November 2016. She handled a wide range of day-to-day needs at the property, including code inspection issues. Ms. Lloyd explained that Washington Manor had several buildings that needed work due to the fire damage and various other issues. She said there was so much work that needed to be done at the property that contractors regularly visited the site, wanting to bid on the work. She had

---

[1] As we noted in a prior appeal,

Section 246 of the City of Memphis Charter . . . provides that the City may terminate an employee for "just cause," and provides that "[j]ust cause shall exist when the employer had a reasonable basis for the action taken." Section 248 of the Charter provides that on appeal to the [Civil Service] Commission, "[t]he burden of proof required to sustain the action of the City shall be by a preponderance of the evidence. If, after a presentation of the proof, the hearing officer finds that there exists a reasonable basis for the disciplinary action taken, the action of the City shall be sustained.

*Cooper v. City of Memphis Civil Serv. Comm'n*, No. W2018-01112-COA-R3-CV, 2019 WL 3774086, at *4-5 (Tenn. Ct. App. Aug. 12, 2019) (quoting *Holmes v. City of Memphis Civil Serv. Comm'n*, No. W2016-00590-COA-R3-CV, 2017 WL 129113, at *9 (Tenn. Ct. App. Jan. 13, 2017)). Thus, in order "[t]o prevail in the Commission proceedings, the City [is] required to demonstrate, by a preponderance of the evidence, that [the employee] violated the applicable rules and that the violation, in light of the circumstances, furnished a reasonable basis for terminating his employment." *Holmes*, 2017 WL 129113, at *9.

advised the on-site manager to have contractors leave business cards for her to review and contact them for bids. Ms. Lloyd said that one of the business cards she reviewed belonged to Washington.

When asked if she personally had any interactions or conversations with Washington, Ms. Lloyd responded:

> He came by the property and asked who was doing the work, and he told me that he was a contractor and that he could do the work cheaper than anybody around because he knows the property very well. That he has been an inspector and he knows, that he has contacts, that he could do the work because he was a contractor himself.

Ms. Lloyd said this interaction made her feel "kind of upset" because Washington was wearing his Code Enforcement uniform, which "made [her] feel kind of obligated to use him, because he had been on the property citing us for different issues." During cross-examination, Ms. Lloyd conceded that Washington did not "ask me to let him do the work." However, she reiterated that Washington told her, "[Y]ou have a lot of issues on this property, I can help you get those done. I am a contractor, and I will be able to do it a lot cheaper, because I know the property and I have the manpower." Ms. Lloyd explained that this made her uncomfortable because she "didn't want to be obligated to somebody that would be able to make or break me as far as doing the work on the property." She added, "if Code Enforcement is going to come in and inspect the property, I don't want them to be biased to who I use as a contractor." Ms. Lloyd noted that this was the only occasion in which she personally spoke to Washington, but she said he had been to the apartment complex several other times. She also clarified that Washington did not give her his business card during their encounter and that she had obtained it from the maintenance worker.

Ms. Lloyd said she verbally informed Supervisor Jones "that I felt very uncomfortable having [Washington] wanting to do the work, and I said I want to report him." Ms. Lloyd said Supervisor Jones asked her to put her complaint in writing, so she sent a letter. Ms. Lloyd said the substance of her written letter was essentially the same as the verbal testimony she had just given. She acknowledged that her letter stated that Washington had conversed with her staff and tried to intimidate them to use his contracting service by referring to his position as inspector. Ms. Lloyd clarified that she was not present for the conversations between Washington and her staff but that her staff members reported the information to her. She said Supervisor Jones took statements from her on-site manager and her maintenance worker.

During his testimony, Supervisor Jones likewise described his initial conversation with Ms. Lloyd, when she complained about Washington, and that he received her written complaint days later. He said he returned to the property to interview additional witnesses,

including other members of management and "the maintenance man." Supervisor Jones testified that Washington had given his business card to the maintenance man. Based on conversations with Ms. Lloyd, Supervisor Jones said his understanding of what had occurred was "pretty much what she put in her complaint: That the maintenance man came to her, that Mr. Washington wanted them to contract the work with him, and that he could do the work because he knows what Code is looking for."

He also described how the investigative process works within the department with fact-finding hearings. Supervisor Jones was the one who prepared the "Hearing Summary and Decision" document, but he said the ultimate decision was made by upper management. The Hearing Summary and Decision document was admitted for a limited purpose as a business record. However, Washington objected to the document on the basis of hearsay, and the commissioner cautioned counsel for the City that it would "have to prove the truth of any matters asserted therein." Counsel confirmed that he was offering the document to show that due process was afforded and that Washington was given an opportunity to be heard.

Because Washington was alleged to have "solicited and/or taken a bribe, a fee, a favor, or a gift" in the course of or in connection with work, under Paragraph 6 of the personnel policy, Supervisor Jones was asked his opinion as to which of those items Washington allegedly solicited or took. Supervisor Jones said he interpreted the policy to mean that discipline is appropriate when the employee has "solicited" anything, not just one of the listed items. Thus, Supervisor Jones believed that Washington violated the policy simply by soliciting work. However, Supervisor Jones was not the ultimate decision-maker as to disciplinary matters.

After the City closed its proof, Washington presented testimony from a former manager of the Washington Manor apartment complex, who testified that she had met with Washington in 2016 and that he never proposed to do work as a contractor. Washington also testified. He insisted that he did not "ask [Ms. Lloyd] to allow him to do contractor work," nor did he "otherwise solicit" any work from the staff at Washington Manor. Reading directly from the Hearing Summary and Decision, Washington said that during the fact-finding hearing with Supervisor Jones, he was asked if he had ever solicited work from the staff at Washington Manor and answered, "No, I did not." Referencing the pertinent language in the personnel policy, Washington testified that he never solicited a bribe, fee, gift, gratuity, or anything of that nature, and he did not act in a manner inconsistent or incompatible with his duties.

Washington conceded, though, that he is a general contractor and that he carried business cards reflecting this information while working for the City. Washington also admitted that he had given one of these business cards to an individual at Washington Manor. When asked if he knew that person to be a staff member of the apartment complex, Washington responded, "No, he did not identify himself as being an employee of the

- 5 -

Washington Manor."  Washington's testimony about why he gave his contractor business card to this individual was a bit unclear.  He stated,

> I was there, he was talking about -- he said, Do you know anybody that might be hiring.  I said, No, I don't know anybody that might be hiring, but I'll give you one of my cards and if anybody comes to me, you know, give a call at some time if anybody contacts me about a job.  I'll give them your information.

Washington also admitted that he had a conversation with Ms. Lloyd and that he disclosed to her that he was a general contractor.  Again, however, his explanation for doing so was somewhat inconsistent.  The following exchange occurred:

> Q.    Okay. Did you have a conversation with Ms. Lloyd?
> A.    I did.
> Q.    Did you ever mention that you were a contractor and that you could do that work?
> A.    It came up to the point to where in doing my job *I always let them know, anywhere I go in the City I let them know* that I am qualified to do this job, because I am a contractor.
> Q.    Do you believe you did that with Ms. Lloyd?
> A.    That is the only reason that I would even mention that, because of the qualification that I would have like to have them to know, because it is known that the City itself is not qualified, does not have qualified people that are actually code inspectors. . . .

(emphasis added).  Washington changed his testimony when he was asked if his conversations about being a contractor had ever led to him getting hired by other property owners to do a job.  At that point, Washington denied that it was part of his "regular course" to inform property owners about his contracting background.  As a result, Washington was asked again to explain his conversation with Ms. Lloyd.  This time, he said, "If she would have asked me was I qualified to do that, then I would have told her that."

After the hearing, the commissioner issued a written decision upholding Washington's termination.  The commissioner concluded that Washington "failed to explain adequately why he was handing out his personal business card, while on City business."  The commissioner found Ms. Lloyd's testimony "was credible in explaining that Washington handed out his personal business card in order to solicit work for his contracting business."  The commissioner noted that Washington did not suggest any motive for Ms. Lloyd to fabricate her story or otherwise adduce proof that she was not credible in her accusation.  The commissioner described the situation as "one person's word against another, necessitating a credibility assessment."  The commissioner also noted that Supervisor Jones had taken statements from other witnesses at the apartment

complex and found that these other witnesses corroborated Ms. Lloyd's account before he took further disciplinary measures. Although the commissioner declined to consider the substance of those statements due to hearsay concerns, the commissioner found that this investigative process indicated that the City did not act arbitrarily or capriciously in making its decision to commence disciplinary proceedings.

Again, the commissioner found that Ms. Lloyd's "live testimony" was credible in explaining why Washington handed out his personal business card during a workday while in uniform. Thus, the commissioner found that there was a sufficient basis for the City to conclude that Washington "solicited work outside the scope of his assigned duties" and "acted in a manner inconsistent, incompatible, or in legal, technical, or moral conflict with his assigned duties, functions and responsibilities" within the meaning of the personnel policy.

Finally, the commissioner noted that the City had based its decision to terminate on Washington's disciplinary history and work performance and that Washington did not challenge the listing of multiple violations of work policies and rules. Discerning no argument about the severity of the discipline imposed, the commissioner upheld termination.

Washington appealed to the full Civil Service Commission. Among other things, he argued that he was not afforded due process because the person who made the ultimate decision to terminate him, Director Robert Knecht, did not testify at the hearing before the commissioner. Washington claimed that he was not aware of the fact that Director Knecht was the ultimate decision-maker until the date of the hearing. As a result, the full Commission remanded the matter to the commissioner to give Washington the opportunity to "confront" Director Knecht. The Commission clarified that the parties could rely on the original transcript, supplemented with the testimony of Director Knecht, rather than repeating the entire hearing.

At the additional hearing before the commissioner on remand, Director Knecht was the only witness to testify. He was the Public Works Director for the City of Memphis. In that position, Director Knecht reviewed investigations on personnel matters for the department and made "the final decision" with regard to suspensions or terminations. Director Knecht was consulted in Washington's case and had reviewed the complaint against him and the investigation that had been conducted. Director Knecht said that one of the documents on which he relied was the letter from Ms. Lloyd. He was of the opinion that her letter "merit[ed] serious consideration" because it was "a statement from a witness firsthand" of her interaction with Washington. He noted that Ms. Lloyd "took the time to write a statement" about the incident, he had no reason to doubt her sincerity, and he considered her statement to be "honest and factual." Director Knecht acknowledged that he was not an eyewitness to the conversation but said that is why his department relies on the fact-finding process to allow employees to present evidence and respond to charges.

Director Knecht said that he spoke with Supervisor Jones "in-depth" about what information he was able to gather during the fact-finding process in order to be sure that "due diligence" had been exercised. Director Knecht also reviewed the summary of the fact-finding hearing, which reflected Washington's statements on the matter.

Director Knecht testified that Washington's case involved "severe violations of City policies," which led to the decision to terminate him. He explained that Washington had engaged on behalf of Code Enforcement "to be a contractor to correct the violations that he was citing", which would be "a huge conflict of interest and [] unacceptable." Director Knecht said that Washington "solicited business," while a representative of Code Enforcement, to address the issues he had cited, thereby abusing his power and authority and the public trust. Simply put, he stated, "As an inspector you cannot also be the person to correct work that you're also citing[.]" When asked if Washington actually completed any work, Director Knecht responded, "He offered to." Considering this severe violation of policy, in addition to Washington's prior work history with several suspensions in the previous two years, Director Knecht found "a trend in negative workplace behavior" indicating that Washington was unwilling to change his behavior.

On cross-examination, Director Knecht was asked about the specific language of the City policies allegedly violated. He clarified, "I never said that he solicited a bribe[.]" Instead, Director Knecht took the position that Washington "solicited business." Acknowledging that Paragraph 6 provides for discipline if the employee "has solicited and/or taken a bribe, a fee, a favor, or a gift in the course of work," Director Knecht was of the opinion that "[s]olicitation of work would be a solicitation of a fee[.]" He said that soliciting work would be an attempt to earn money or a fee. Director Knecht conceded that no fee was discussed but pointed out that Washington said he could offer "a better price" than other contractors because he knew what the City would be looking for during inspections. In his opinion, that constituted the solicitation of a fee. With respect to Paragraph 17, Director Knecht believed that Washington violated that section by abusing his authority and the public trust and intimidating members of the public, which, he said, would constitute activities inconsistent or incompatible with his assigned duties and responsibilities.

After this additional hearing, the commissioner issued another decision, describing the supplemental testimony of Director Knecht. The commissioner again found that Washington's violations of the personnel policy provided a sufficient basis for the actions taken. The commissioner noted that Paragraph 17 prohibited "engaging in enterprises inconsistent, incompatible, or in legal, technical, or moral conflict with the employee's assigned duties." With respect to Paragraph 6, the commissioner concluded that Washington's statement that he could do the work at a good price could "reasonably be interpreted as solicitation of a favor[,] i.e.[,] to contract him to perform the work."

Washington sought judicial review of the commissioner's decision in chancery

court pursuant to Tennessee Code Annotated section 4-5-322. Washington argued that he had not violated Paragraph 6 or Paragraph 17 of the personnel policy. He argued that the letter from Ms. Lloyd and the written summary of the fact-finding hearing were "inadmissible hearsay" having "no probative value" and that they should not have been considered. He argued that the commissioner did not admit these exhibits "for the truth of the matters asserted."

After reviewing the record and holding a hearing, the chancery court entered an order denying Washington's petition. At the outset, the chancery court noted that the parties stipulated that this case did not involve an allegation of bribery. The chancery court further noted that "[t]he Parties agreed the standard of review is a preponderance of the evidence standard." After summarizing the basic facts and procedural posture of the case, the chancery court found that just cause for termination existed based on Washington's violation of Paragraph 6 and Paragraph 17 of the personnel policy. With specific reference to the language in Paragraph 6, the chancery court found that "solicitation in and of itself is a violation of this policy" and that it was not necessary for solicitation to be "paired with something else" mentioned in the policy. The chancellor concluded that this case involved "a classic he said/she said situation." He found it persuasive that Ms. Lloyd "took it upon herself" to report the interaction to Washington's supervisor. The chancellor found no evidence or argument as to why she would make such a report if it did not occur. The chancellor noted that there would be no benefit to her for reporting the exchange. Thus, the chancellor found that Washington failed to rebut the City's evidence that the exchange did occur. Also, the chancellor observed that the commissioner had personally observed the witnesses and come to the same conclusion, and the role of the chancery court was to defer to the commissioner's credibility determination. "[E]valuating the administrative record as a whole," the chancery court found that the City had sufficient just cause to terminate Washington. Washington then filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Washington presents the following issues, as we perceive them, for review on appeal:

1. Whether the chancery court failed to apply the appropriate standard of review pursuant to Tennessee Code Annotated section 4-5-322;
2. Whether the parties' stipulation that there was no bribery entirely eliminated Paragraph 6 from consideration;
3. Whether the chancery court erred in concluding that solicitation can, standing alone, serve as a basis for termination, rather than requiring solicitation of a bribe, fee, favor, or gift;
4. Whether Exhibits 1 and 4 contain uncorroborated hearsay such that they cannot provide substantial and material evidence to sustain the decision of the Commission; and

- 9 -

5. Whether the administrative record as a whole contains substantial and material evidence supporting the Commission's finding that the City had just cause to terminate Washington.

For the following reasons, we affirm the decision of the chancery court upholding termination.

### III. STANDARD OF REVIEW

"Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322." Tenn. Code Ann. § 27-9-114(b)(1); *see also Moss v. Shelby Cty. Civil Serv. Merit Bd.*, 597 S.W.3d 823, 830 (Tenn. 2020). "Accordingly, Tennessee Code Annotated section 4-5-322(h) contains the standard of judicial review that is used to review decisions of the City of Memphis Civil Service Commission." *Davis v. City of Memphis*, No. W2016-00967-COA-R3-CV, 2017 WL 634780, at *3 (Tenn. Ct. App. Feb. 16, 2017) (citing *City of Memphis v. Lesley*, No. W2012-01962-COA-R3-CV, 2013 WL 5532732, at *6 (Tenn. Ct. App. Oct. 7, 2013)). Pursuant to this section,

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h). "This scope of review is the same for the trial court, intermediate appellate court, and [the supreme court]." *Davis v. Shelby Cty. Sheriff's Dep't*, 278 S.W.3d 256, 264 (Tenn. 2009) (citing *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn. Ct. App. 1999)).

On appeal, "we take into account whatever in the record fairly detracts from the

weight of the evidence, but we may not substitute our own judgment on questions of fact by re-weighing the evidence." *Id*. at 265. We may reject the decision "only if a reasonable person would necessarily reach a different conclusion based on the evidence." *Id.* (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)). "It is not enough that the facts could support a different conclusion." *Id.*

## IV. DISCUSSION

### A. The Chancery Court's Standard of Review

The first issue we will address on appeal is whether the chancery court applied an incorrect standard of review when considering the Commission's decision. The chancery court's order states that "the Parties agreed the standard of review is a preponderance of the evidence standard." Indeed, the transcript of the hearing before the chancellor reflects that Washington's attorney stated, "The standard of review is a preponderance of the evidence, Your Honor." The chancery court's order went on to state that based on "this Court's examination of all of the evidence," the City "had just cause in terminating [Washington] based on his violation of the two personnel policies." The chancery court found that Washington advised Ms. Lloyd, while at the apartment complex to conduct inspections, "that he was a contractor and could perform the necessary improvements to get the complex within code." The chancery court found that Ms. Lloyd complained about this and advised Supervisor Jones that her staff felt intimidated to utilize Washington's services. As previously noted, the chancery court found that this case presented "a classic he said/she said situation" but placed weight on the fact that Ms. Lloyd took it upon herself to report Washington's behavior when she would not benefit from doing so. It also noted the credibility assessment made by the commissioner who heard the live testimony. "Looking at the administrative record as a whole," the chancery court found that Washington failed to rebut the City's evidence that the exchange did occur as stated by Ms. Lloyd. The chancery court noted that it was confined to the administrative record pursuant to section 4-5-322(g), but it did not mention section 4-5-322(h).

To the extent that the chancery court accepted the parties' agreement that "the standard of review is a preponderance of the evidence standard," the court erred. The narrow standard of review is that set forth in section 4-5-322(h). However, the chancery court's error does not require reversal by this Court. The "substantial and material evidence" standard of section 4-5-322 has been interpreted as requiring "less than a preponderance of the evidence." *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 669 (Tenn. 2016). If the chancery court concluded that the City's action should be sustained utilizing a preponderance of the evidence standard, then, by necessity, the evidence would also meet the lesser substantial and material evidence standard. As such, the application of the preponderance of the evidence standard was harmless error in this case.

We also note that the applicable scope of review of the Commission's decision is the same for the trial court and the appellate court. *See id.* ("An appellate court applies the same limited standard of review as the trial court.") Therefore, this Court can apply the appropriate standard of review when considering the decision of the Commission. *See Metro. Gov't of Nashville v. Civil Serv. Comm'n of the Metro. Gov't of Nashville*, No. M2015-01488-COA-R3-CV, 2016 WL 3662306, at *13 (Tenn. Ct. App. June 30, 2016) ("Under the UAPA, this court, like the trial court, must apply the substantial and material evidence standard to the agency's factual findings."); *Wilson v. City of Memphis*, No. W2014-01822-COA-R3-CV, 2015 WL 4198769, at *11 (Tenn. Ct. App. July 13, 2015) ("[B]ecause the standard of review requires this Court to review the decision of the Commission rather than the trial court, a trial court's failure to make sufficient findings of fact and conclusions of law will not always be fatal.").[2]

## B. Stipulation Regarding Bribery

Next, Washington argues that because the parties stipulated that he did not engage in "bribery," Paragraph 6 of the personnel policy was "eliminated . . . from the case in its entirety." We disagree. Paragraph 6 stated that disciplinary action could be taken when "[t]he employee has solicited and/or taken a bribe, a fee, a favor, or a gift in the course of work, or in the connection [sic] with work." Clearly, soliciting or taking "a bribe" is one of multiple ways in which this policy can be violated. Since the original hearing before the commissioner, the City has made it clear, all along, that it was not alleging that Washington solicited or took a bribe. However, that does not mean that Paragraph 6 became irrelevant or that it was eliminated from the case. We find no merit in this argument.

## C. Solicitation

The next issue also involves the interpretation of Paragraph 6. Again, the policy provides for disciplinary action when "[t]he employee has solicited and/or taken a bribe, a fee, a favor, or a gift in the course of work, or in the connection [sic] with work." The chancery court concluded that "solicitation in and of itself is a violation of this policy" and that "solicitation may be used in conjunction with the words following the phrase or may stand on its own." The chancellor reasoned that there is no need for "solicitation" to be "paired with something else." Washington argues that this was an erroneous interpretation.

---

[2] We took a similar approach in *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 820-21 (Tenn. Ct. App. 2005), when concluding that the trial court erred by employing the "substantial and material evidence" standard of section 4-5-322(h)(5) to review an administrative forfeiture order. We applied the correct "preponderance of the evidence" standard of review on appeal, although noting that it would impose a heavier burden. *Id.* at 821 n.10. *See also Tubbs v. Long*, 610 S.W.3d 1, 8 (Tenn. Ct. App. 2020) ("Although we agree that preponderance of the evidence, not substantial and material evidence, is the proper standard of review, we conclude that the trial court's use of the incorrect standard does not mandate reversal.").

He asks this Court to "decide the correct interpretation" and "reach a correct result."

Neither Director Knecht nor the Commission applied the interpretation utilized by the chancery court. Director Knecht took the position that "[s]olicitation of work would be a solicitation of a fee" because it was an attempt to earn money. Because Washington said he could offer "a better price" than other contractors, Director Knecht considered his actions as soliciting a fee. The commissioner did not explicitly reject this interpretation but did find that Washington's statement that he could do the work at a good price could "reasonably be interpreted as solicitation of a favor[,] i.e.[,] to contract him to perform the work." Thus, for purposes of this appeal, it is not necessary to consider the chancery court's alternative interpretation of the policy and whether an employee could also be terminated for solicitation "in and of itself." That was not the basis for the termination in this case. We must apply the appropriate standard of review to *the Commission's decision* and determine whether it was arbitrary and capricious or unsupported by substantial and material evidence. Any alleged error by the chancery court in its alternative interpretation of the policy does not impact our analysis.

### *D. Hearsay*

Next, Washington argues that Exhibit 1 and Exhibit 4 consisted of inadmissible hearsay and cannot provide substantial and material evidence to support his termination. Exhibit 1 was the document entitled "Hearing Summary and Decision," which described the policies Washington was alleged to have violated, the underlying facts, his statements during the fact-finding hearing, and the ultimate decision of management. This document notified Washington of the termination of his employment. Exhibit 4 was the letter from Ms. Lloyd.

"By their own terms, the Tennessee Rules of Evidence do not apply to administrative hearings, but rather to court appearances." *Davis*, 278 S.W.3d at 266; *see* Tenn. R. Evid. 101 ("These rules shall govern evidence rulings in all trial courts of Tennessee except as otherwise provided by statute or rules of the Supreme Court of Tennessee.").[3] Generally, when appellate courts review decisions from these less formal hearings, we "are guided, not by the Rules of Evidence, but instead 'by a sense of fair play and the avoidance of undue prejudice to either side of the controversy and [must determine] whether . . . the action of the hearing Board in admitting or excluding evidence was

---

[3] In *Davis*, the Court noted that "'[n]either the technicalities of the Civil Rules of Procedure nor the common law rules of evidence necessarily apply before nonjudicial bodies *unless the rules of that body so require*.'" 278 S.W.3d at 266 (quoting Goodwin v. Metro Bd. of Health, 656 S.W.2d 383, 388 (Tenn. Ct. App. 1983)). *Davis* involved the Shelby County Civil Service Merit Board, and the Court noted that the Civil Service Merit Act did not provide that hearings before the Board were subject to the Rules of Evidence. *Id.* Here, there is nothing in the record to suggest that the Rules of Evidence have been adopted by the City of Memphis Civil Service Commission. According to the City's brief, "the Civil Service Commission has not adopted the Tennessee Rules of Evidence."

unreasonable or arbitrary.'" *Davis*, 278 S.W.3d at 266 (quoting *Goodwin, 656 S.W.2d at 388*). However, in contested case proceedings pursuant to the Uniform Administrative Procedures Act,[4] a somewhat "relaxed standard" governs the admissibility of evidence. *Robertson v. Tenn. Bd. of Soc. Worker Certification & Licensure*, 227 S.W.3d 7, 14 (Tenn. 2007). The UAPA provides, in pertinent part,

> The agency shall admit and give probative effect to evidence admissible in a court, and when necessary to ascertain facts not reasonably susceptible to proof under the rules of court, evidence not admissible thereunder may be admitted if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs.

Tenn. Code Ann. § 4-5-313(1). "Although the UAPA does not clearly specify the standard to be used to review decisions regarding the admission or exclusion of evidence, we have previously determined that they should be reviewed using the same standard used to review similar decisions by trial judges—the abuse of discretion standard." *Feldman v. Tenn. Bd. of Med. Examiners*, No. M2010-00831-COA-R3-CV, 2011 WL 2536471, at *13 n.3 (Tenn. Ct. App. June 27, 2011) (citing *Tenn. Dep't of Health v. Frisbee*, No. 01A01-9511-CH-00540, 1998 WL 4718, at *2 (Tenn. Ct. App. Jan. 9, 1998)).

We begin with Washington's argument regarding Exhibit 4, the letter written by Ms. Lloyd to Supervisor Jones after he asked her to put her complaint in written form. On appeal, the City argues that Washington cannot complain about the admission or consideration of Exhibit 4 because he admitted it into evidence. We agree. During the City's examination of Supervisor Jones, he testified about receiving Ms. Lloyd's letter, but it was not admitted into evidence. Likewise, Ms. Lloyd testified that her letter essentially stated the same facts she had discussed during her testimony, and she used the letter to refresh her recollection as to the name of the supervisor, but it was not admitted during direct examination by the City. During cross-examination of Ms. Lloyd, Washington's attorney asked her additional questions about the letter and stated, "I'll make that a defense exhibit." The commissioner noted that the letter had not yet been admitted into evidence, and counsel for *the City* then argued that it was hearsay. Nevertheless, Washington's attorney insisted, "This is my exhibit." He stated his intention to use the letter to impeach Ms. Lloyd and Supervisor Jones. The City continued to argue that the letter contained hearsay but the commissioner responded, "well, I'm going to admit it." Given the circumstances, Washington cannot reverse course and argue on appeal that Exhibit 4 should not be considered because it contains hearsay. It was Washington who introduced the letter as evidence.

---

[4] "[T]he Memphis Civil Service Commission is governed by the state's UAPA and the contested case procedures contained therein." *Mosley v. City of Memphis*, No. W2019-00199-COA-R3-CV, 2019 WL 6216288, at *6 (Tenn. Ct. App. Nov. 21, 2019) (citing *Marino v. Bd. of Admin. City of Memphis Ret. Sys.*, No. W2015-00283-COA-R9-CV, 2015 WL 7169796, at *4 (Tenn. Ct. App. Nov. 16, 2015)).

We now consider Washington's argument regarding Exhibit 1, the "Hearing Summary and Decision" provided to him after the fact-finding hearing. Supervisor Jones identified this document during his testimony and explained its role in the disciplinary process. He explained that departmental policies required the preparation of this document. Washington objected to admission of the Hearing Summary and Decision on the basis of hearsay. Counsel for the City clarified that he was only seeking to introduce the Summary as a business record and that Supervisor Jones was going to testify as to the fact-finding hearing, his findings, and the alleged violations. The commissioner decided that the Summary would be admitted for that limited purpose as a business record and to show that Washington was afforded due process and an opportunity to be heard. However, the commissioner cautioned the City that it would still have to prove "the truth of any matters asserted therein." During cross-examination, counsel for Washington asked both Supervisor Jones and Director Knecht about the substance of the Summary. Also, during Washington's testimony, his attorney asked him to read into evidence, from the Summary, a question and answer from the fact-finding hearing. His counsel also read part of the question and answer section of the Summary to the commissioner during his arguments, on more than one occasion. Still, the commissioner recognized in her written decision that Exhibit 1 was admitted for a limited purpose. She noted that Exhibit 1 indicated that there was a fact-finding hearing and identified the allegations against Washington. At the same time, she emphasized that the substance of the "actual statements" that were made to Supervisor Jones were hearsay and not admissible for the truth of the matters asserted. The commissioner explained that she considered the fact that Supervisor Jones took statements from additional witnesses as evidence that the City did not act arbitrarily or capriciously in commencing the disciplinary proceedings.

Washington's argument on appeal with respect to Exhibit 1 is somewhat difficult to follow. In his issue presented and related sub-issues, he contends that *the chancery court* erroneously considered the substance of Exhibit 1 "as proof of the matters asserted therein" when the commissioner had admitted Exhibit 1 for a limited purpose. Again, however, this Court must review the decision of *the Commission* utilizing the same scope of review as the chancery court. Under the circumstances, we cannot say that the commissioner abused her discretion in admitting the Summary for a limited purpose. *See Case v. Shelby County Civil Service Merit Bd.*, 98 S.W.3d 167, 176 (Tenn. Ct. App. 2002) (finding no error in the admission of a Loudermill hearing transcript).

### E. Just Cause for Termination

Finally, we reach Washington's issue regarding whether the administrative record as a whole contains substantial and material evidence to support the Commission's conclusion that the City had just cause to terminate him. Washington notes that he was originally charged with violating a memorandum of understanding with the local union in addition to the two alleged violations of the City's personnel policy. All three of these

alleged violations were based on the same conduct – his solicitation of work at the Washington Manor apartment complex. After the first hearing, the Commission found that there was a sufficient basis for the City to conclude that Washington's conduct violated the memorandum of understanding with the union and the two paragraphs of the City's personnel policy. After the matter was remanded for supplemental testimony, the Commission noted that it was not clear from the record whether the memorandum of understanding allegedly violated was actually in effect at the time of the violation. "Regardless," the Commission explained, Washington's "violations of the work rules found in [the] City of Memphis Personnel Manual" provided a sufficient basis for the action taken. In a similar manner, the chancery court concluded that the memorandum of understanding with the union was unenforceable but that the City "still had just cause" to terminate Washington because his conduct violated two sections of the personnel policy. We agree. The City does not challenge the chancery court's ruling that the memorandum of understanding was unenforceable. However, the personnel policy is entitled "Grounds for Disciplinary Action" and provides that employees of the City who fail to abide by established rules are subject to disciplinary action. It specifically provides that disciplinary action may be taken when:

6.      The employee has solicited and/or taken a bribe, a fee, a favor, or a gift in the course of work, or in the connection [sic] with work.
. . .
17.      The employee has either on or off the employee's regular duty hours engaged in employment activities, or enterprises that are inconsistent, incompatible, or in legal, technical, or moral conflict with the employee's assigned duties, functions, and responsibilities.

It further provides, "None of the aforementioned will be deemed to prevent the dismissal, demotion, suspension, or other disciplinary action of an employee for just cause. Just cause shall exist when the employer has a reasonable basis for the action taken even though such cause is not contained among those mentioned above." Thus, Washington was subject to disciplinary action, including termination, for his violations of the City's personnel policy without regard to whether his conduct also violated the memorandum of understanding with the union.

Washington argues that there was no substantial and material evidence to support a finding that he violated Paragraph 6 based on the stipulation that there was no bribe. However, we have already rejected that argument. Paragraph 6 was not "removed from the case." Notably, on appeal, Washington did *not* argue that his solicitation of work would not constitute solicitation of a "fee," as Director Knecht opined, or solicitation of a "favor," as the Commission found. Instead, Washington argues that he did not "solicit" anything because he did not "ask" to do the work. During cross-examination of Ms. Lloyd, Washington's counsel asked her if Washington ever "ask[ed] you to let him do the work[.]" Ms. Lloyd said, "No, he didn't ask me to let him do the work." However, she later clarified

her answer by stating, "For me, when he told me, No. 1, that he was a contractor and he could do the work because he knew the property, he could do it cheaper because he was his own contractor or whatever. To me, that says I know you're getting bids, let me bid, and I can do the work." In addition, the Commission found that Washington handed out his personal business card "in order to solicit work for his contracting business." We reject Washington's argument that his conduct would not constitute solicitation.[5]

As for Paragraph 17, Washington argues that there was simply no evidence presented about whether he violated this section aside from his denial that he did so. The record reflects otherwise. Director Knecht testified as to his conclusion that Washington solicited business, while acting as a representative of Code Enforcement, seeking to address the very issues he had cited at the apartments. He considered this to be a conflict of interest, an abuse of Washington's authority, and an abuse of the public trust. He also characterized Washington's actions as intimidation of the public. Director Knecht testified that all of these actions represent conduct prohibited by Paragraph 17. In other words, Director Knecht explained, abusing one's authority, violating the public trust, and intimidating the public, would be acts that were inconsistent, incompatible, or in moral conflict with an employee's duties, functions, and responsibilities, within the meaning of Paragraph 17. We reject Washington's assertion that there was "no mention or proof presented" of any violation of Paragraph 17.

Finally, Washington continues to argue that Ms. Lloyd's "uncorroborated hearsay" impermissibly "infect[ed] the City's entire case." He acknowledges that hearsay is admissible in administrative hearings but contends that "uncorroborated hearsay does not constitute substantial and material evidence." *Bobo v. State Real Estate Comm'n*, No. M2013-02037-COA-R3-CV, 2014 WL 1852604, at *9 (Tenn. Ct. App. May 5, 2014) (internal quotation omitted). Here, however, uncorroborated hearsay was not the sole evidence of Washington's wrongful acts. Ms. Lloyd testified at the hearing before the Commission and described firsthand (without objection) her interaction with Washington. In addition, Washington introduced her letter further describing his conduct. During his testimony, Washington admitted that he had a conversation with Ms. Lloyd and that he mentioned being a contractor. He also admitted that he left his personal business card with someone at the property. The Commission found that Washington failed to adequately explain why he handed out his business card while on City business. On the other hand, the commissioner found Ms. Lloyd's live testimony about their interaction to be credible.

"Resolving conflicting evidence is a job for the Commission, not the courts."

---

[5] Washington did argue in his reply brief that he did not solicit a fee because Director Knecht conceded that no "fee" was discussed. We reject this argument for two reasons. It is waived for failure to raise it in his original appellate brief. *See O'Dneal v. Baptist Mem'l Hosp.-Tipton*, 556 S.W.3d 759, 763 n.2 (Tenn. Ct. App. 2018) (explaining that issues raised for the first time in a reply brief are waived). Additionally, Director Knecht went on to explain that he considered Washington's statement that he could offer "a better price" to be a solicitation of a fee.

*Holmes*, 2017 WL 129113, at \*9. This Court can reject the Commission's decision "only if a reasonable person would necessarily reach a different conclusion based on the evidence." *Davis*, 278 S.W.3d at 265. That is not the case here. Giving due deference to the commissioner's credibility determinations, we conclude that substantial and material evidence supports the Commission's conclusion that Washington's conduct violated Paragraphs 6 and 17. We further conclude that Washington's disciplinary violations furnished a reasonable basis for terminating his employment. The Commission's decision was not arbitrary or capricious.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Kenneth Washington, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE