IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 9, 2021 Session

## DAVID THACKER v. CITY OF GREENEVILLE, TN, ET AL.

**Appeal from the Chancery Court for Greene County**
**No. 2019-CV-51     Douglas T. Jenkins, Chancellor**

———————————————————

**No. E2020-01106-COA-R3-CV**

———————————————————

A police officer appealed his termination by the Town of Greeneville to the Greeneville Civil Service Board, which upheld it. Appellant then appealed to the trial court, which also upheld the termination. Because we conclude that the record lacks information necessary to conduct appellate review, we vacate the trial court's judgment and remand the case to the Board for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

W. Gerald Tidwell, Chattanooga, Tennessee, for the appellant, David Thacker.

Jeffrey M. Ward and Thomas Wood Smith, Greeneville, Tennessee, for the appellee, City of Greeneville, TN, and Civil Service Board of Greeneville, TN.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

David Thacker ("Appellant") had been a police officer for the Town of Greeneville[1] Police Department ("GPD") since 1997. His employment was terminated on or about September 12, 2018 by Greeneville's City Administrator, upon the recommendation of GPD Chief Tim Ward. The termination of his employment was based at least in part on his

---

[1] The Town of Greeneville is alternately referred to as the City of Greeneville. For ease of reference, we will refer to it as "Greeneville."

handling of a dispatch call on August 31, 2018 from a man named Andy McCloud, who reported being hit and injured by the mirror of a truck ("the McCloud incident"). According to Appellant, Mr. McCloud sounded in his right mind when he called, and did not indicate that he was in pain other than that his shoulder was sore. Appellant asserts that he offered medical care to Mr. McCloud three times and offered to have Emergency Medical Services transport Mr. McCloud to the hospital, which Mr. McCloud declined, instead saying that he would walk to the hospital, which was close by. According to Appellant, GPD's policy is not to transport injured people in patrol cars, and his priority was for Mr. McCloud to receive medical treatment, so he did not send a patrol car because that would only have delayed Mr. McCloud from reaching the hospital. It is undisputed that Appellant did not put out a "Be on the Lookout" ("BOLO") for the truck or send a patrol officer to the scene. However, he instructed Mr. McCloud to call back upon arriving at the hospital so that he could send an officer to the hospital. Upon arriving at the hospital, Mr. McCloud called back as instructed, and an officer was dispatched.[2]

Appellant also claims that he asked Mr. McCloud for a description of the vehicle that hit him, which Mr. McCloud said was a silver F-150. But when Appellant asked if the vehicle was damaged or otherwise stood out in a way that would help identify it, Mr. McCloud answered no. Later, however, Mr. McCloud gave a written statement to Officer Ellis, in which he claimed the mirror was broken and there "was just wire holdin[g] it on the truck."

According to Appellant, in view of Mr. McCloud's immediate medical needs, the generic description Mr. McCloud had provided of the vehicle, the lapse of time since the incident, and the fact that Mr. McCloud and the vehicle had both left the scene, Appellant exercised his discretion to make the determination that a BOLO or a responding officer at the scene would be futile. According to Greeneville, Appellant also did not enter the information from the call into the Computer Assisted Dispatch ("CAD") system, as required.[3] However, it is unclear from the record if the call was a transfer from 911—if it was, according to Appellant, then the call would normally have been entered by the 911 workers and not entered a second time by Appellant.

Appellant's handling of the McCloud incident was investigated internally, and the investigating officer characterized Appellant's behavior as, inter alia, "borderline negligent" in not doing more to care for Mr. McCloud's safety. The termination notice provided to Appellant by GPD stated that he was being terminated based on the following charges, coupled with his disciplinary history:

---

[2] Appellant sent Officer Ellis to the hospital. One page of Officer Ellis' report states that he "responded to a crash at the crash location" at 12:15 PM. Another page, however, says that he met Mr. McCloud at the hospital at 12:15 PM.

[3] However, the Board's reply brief at trial states that Appellant "did not enter any information into a database until after the first call," suggesting Appellant at least entered some information into the CAD after he received a call back from Mr. McCloud when Mr. McCloud arrived at the hospital.

**1.1 Employees Responsibilities** in that you received a phone call for assistance from a citizen whom stated that he has been struck by the mirror of a passing truck as he walked alongside the roadway . . . . However, you did not send him assistance.

**2.4 Attentiveness to Duty** in that based on the charge above 1.1, you furthermore did not enter a call/complaint into the [CAD] system, nor did you dispatch a [BOLO] for the truck that had struck the victim.

Other disciplinary events from Appellant's past that may have contributed to his termination include an incident where Appellant missed a departmental meeting held at a Fraternal Order of Police ("FOP") facility on Sunday, July 22, 2018. He was advised of the meeting via text message, not the usual GPD messaging system. He asserts that he was told the meeting was not mandatory, and that he did not intend to miss it but did so for health reasons; it is undisputed that Appellant has diabetes. Appellant was suspended for twenty-one hours and deprived of "Extra Duty privileges" for a month. He appealed his punishment through what appears to be GPD's and/or Greeneville's grievance process.[4] Another event occurred on June 5, 2018, at a jail ("the jail incident"), where Appellant had brought an intoxicated arrestee for booking. The jail would not accept the arrestee without certain documentation from the hospital, where Appellant had picked him up. Appellant disagreed with the jail's handling of the situation, and Greeneville asserts that he was unduly rude and challenging to jail staff and a sheriff's deputy, so Appellant received a written reprimand. Additionally, an email in the record from Assistant Chief of GPD Mike Crum to Appellant on July 20, 2018 advised Appellant of some issues with his performance, including the need to "[e]nter all calls into the CAD and dispatch as soon as possible." In the same email, Assistant Chief Crum wrote, "There's no need to bring up the past. Do your job moving forward."

Appellant appealed his termination to the Greeneville Civil Service Board (the "Board"), which upheld the termination after a hearing in front of three Board members on December 18, 2018. At the hearing, Appellant testified, along with Tracy Jones, Records Clerk for GPD. Ms. Jones overheard Appellant's call with Mr. McCloud on August 31, 2018, and her testimony effectively corroborates Appellant's version of events. She also said that Appellant told her that Mr. McCloud had "said he was walking too close to the road and a mirror hit him." Further, she testified that she had asked Assistant Chief Crum if the FOP meeting on July 22 was mandatory, and he told her to tell Appellant that it was "highly recommended that he be there," so that is what she told Appellant. She stated that she "believe[d] the instructions also said if you can't make [the meeting] to let them know." Appellant did not advise anyone he would be missing the meeting because he asserts he did not intend to miss it.

---

[4] There is mention in the record of what seems like an official set of grievance procedures that Greeneville and/or GPD follows, but the actual procedures are not in the record.

Appellant testified that he had a history of taking "intermittent" leave pursuant to the Family and Medical Leave Act ("FMLA") because he was diagnosed with diabetes in 2011. He asserts that GPD had been aware of his diabetes since 2011, and his FMLA leave had caused some conflict between him and various people at GPD. His testimony implied that he had not been advised of all of the reprimands/disciplinary incidents contained in his GPD file, which was introduced into evidence at the Board hearing. He took issue with how other reprimands and disciplinary incidents in his record were handled. For example, he testified that he was not afforded fair opportunities to explain his sides of issues (outside of the grievance process), and was kept out of the loop when it came to internal investigations related to his disciplinary incidents, including being ignored when he would ask for information and try to work out issues before pursuing the grievance process. He filed grievances on some of his reprimands, but testified that he was given a hard time for doing so. He also testified to the lack of policies in place regarding some of the conduct he was reprimanded for, and that in some instances, he was being treated differently than other employees for similar disciplinary incidents. He also seems to claim that he was not accommodated properly with respect to his diabetes.

In its final order, filed February 15, 2019, the Board concluded that Appellant "failed to submit sufficient evidence to . . . overturn his discipline by [Greeneville]" and found "that the discipline of [Appellant] by [Greeneville] was not politically motivated, . . . was done in good faith for cause, and . . . was appropriate for the circumstances." Appellant filed a petition for writ of certiorari in the Chancery Court of Greene County (the "trial court"). The trial court held a hearing on May 13, 2020, where no additional evidence was presented. The trial court upheld the decision of the Board in its final order filed on July 24, 2020.[5] Appellant appealed.

### ISSUES PRESENTED

Appellant raises the following issues, taken from his brief:

1. Whether the Civil Service Board erred in its decision by concluding that the City had met its burden of showing that the circumstances surrounding Appellant's dismissal warranted termination because, under Tenn. Code Ann. § 4-5-322(h)(5), such decision is unsupported by competent and substantial evidence upon the whole record and involves an abuse of discretion?

2. Whether the Civil Service Board's decision to uphold Appellant's termination is arbitrary, capricious, and characterized by an abuse of

---

[5] In its final order, the trial court "approve[d] and adopt[ed] the City's arguments and explanations for the termination in its Response filed in [the trial court] on April 15, 2019." The second page is missing from the copy of the referenced Response in the technical record.

discretion, under Tenn. Code Ann. § 4-5-322(h)(4), and in violation of the City's own rules and regulations with respect to its progressive disciplinary policies.

Greeneville and the Board raise the following issues, taken from Greeneville's brief:[6]

1. Whether the decision of the Civil Service Board is unsupported by evidence that is both substantial and material in the light of the entire record?

2. Whether the decision of the Civil Service Board was arbitrary or capricious, or characterized by an abuse of discretion or clearly unwarranted exercise of discretion?

### STANDARD OF REVIEW

This Court has previously explained the applicable standard of review as follows:

The courts review the decisions of local civil service boards that affect the status of employees of local governments using Tenn. Code Ann. § 4-5-322(h) (2005)'s[7] standard of review.[8] Tenn. Code Ann. § 27-9-114(b)(1)

[6] Greeneville and the Board filed separate briefs as appellees, but raise the same two issues, though worded slightly differently.

[7] Neither party specifies which version of section 4-5-322 of the Uniform Administrative Procedures Act ("UAPA") it relies on. We will use the version that was in effect when Appellant filed his petition for writ of certiorari in the trial court, which does not differ from the version in effect when *Miller* was filed in ways that affect this appeal. Additionally, neither party argues that the most recent version of section 4-5-322, which did not become effective until May 18, 2021, is controlling.

[8] As this Court recently pointed out,

In *Davis v. Shelby County Sheriff's Department*, the Tennessee Supreme Court explained that in 1988, the General Assembly amended the language of section 27-9-114 [of the Tennessee Code] to read, in pertinent part, "Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under Tennessee Code Annotated, Section 4-5-322, of the [UAPA]." 1988 Tenn. Pub. Acts, ch. 1001. Thus, the legislature deleted the provision requiring common law writ of certiorari review and replaced it with the current provision providing for judicial review under the UAPA. Under *Davis*, [the appellant's] initiating pleading should have been styled, "Petition for Judicial Review." This error does not preclude our review of the appeal, and we note it only for the purpose of edification.

*Campbell v. City of Chattanooga*, No. E2018-02010-COA-R3-CV, 2019 WL 5792884, at *3 n.3 (Tenn. Ct. App. Nov. 6, 2019) (quoting *Davis v. Shelby Cty. Sheriff's Dep't*, 278 S.W.3d 256, 262 (Tenn. 2009)).

The same observation applies to Appellant's initiating pleading here—Appellant filed a "First Petition for Writ of Certiorari," seeking review of the Board's decision pursuant to Tennessee Code Annotated sections 27-8-101 *et seq.* (containing the old common law writ of certiorari) and 27-9-101 *et seq.* The trial court's

(2000).[9] Therefore, both the trial and appellate courts will modify a local civil service commission's decision affecting the status of an employee of local government only if the commission's action (1) violated constitutional or statutory provisions, (2) was in excess of its authority, (3) utilized unlawful procedure, (4) was arbitrary, capricious, or characterized by an abuse or clearly unwarranted use of discretion, or (5) is unsupported by substantial and material evidence. [*See* § 4-5-322(h).][10]

. . . . Tenn. Code Ann. § 4-5-322(h)(4) [and] (5) require the courts to review the commission's decision using a three-step analysis. First, the court must determine whether the commission has identified the appropriate legal principles applicable to the case. Second, the court must carefully examine the commission's factual findings to determine whether they are supported by substantial and material evidence. Third, the court must examine how the commission applied the law to the facts.

While Tenn. Code Ann. § 4-5-322(h) does not explicitly define what "substantial and material evidence" is, the courts have interpreted it as requiring something less than a preponderance of the evidence but more than a scintilla or glimmer. Substantial and material evidence is the amount of relevant evidence that a reasonable person would require to reach a rational conclusion. Thus, substantial and material evidence furnishes a reasonably sound basis for the commission's decision.

Because the application of the law to the facts is a highly judgmental process involving mixed questions of law and fact, the court's review of a commission's decision is limited and deferential to the commission. The courts may neither reweigh the evidence nor substitute their judgment for the commission's, even if the evidence could support a conclusion different from the one reached by the commission. Tenn. Code Ann. § 4-5-322(h)(5)(B). Rather, the courts must determine whether a reasonable person could appropriately have reached the same conclusion reached by the commission, consistent with a proper application of the controlling legal principles.

---

final order similarly cites section 27-8-101 *et seq.* However, the parties agree that the proper standard of review is contained in section 4-5-322(h) of the UAPA, as mandated by section 27-9-114(b)(1).
[9] Section 27-9-114 was amended in 2008. That amendment does not affect this appeal.
[10] We note that the "Notice of Intent to Seek Termination of Employment" provided to Appellant by Chief Ward states that should Appellant appeal his termination to the trial court, "[t]he ground, or grounds, for [his] appeal and the hearing before the [trial court] w[ould] be limited to the issue of whether the action of the [] Board was or was not made in good faith for cause." This appears to be incorrect, considering that trial courts (and appellate courts) are to review administrative actions such as the Board's in this case according to the above standard of review under the UAPA.

Commission decisions that are not supported by substantial and material evidence are necessarily arbitrary and capricious, as are decisions with adequate evidentiary support that are based on a clear error in judgment. In its broadest sense, the arbitrary and capricious standard in Tenn. Code Ann. § 4-5-322(h)(4)

> requires the court to determine whether the administrative agency has made a clear error in judgment. An arbitrary or capricious decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.

***Miller v. Civ. Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cty.***, 271 S.W.3d 659, 664–65 (Tenn. Ct. App. 2008) (footnotes and some citations omitted). In addition, "[a]lthough our review of the Board's factual findings is confined to the provisions of Tennessee Code Annotated section 4-5-322, our review of matters of law is de novo with no presumption of correctness." ***Davis***, 278 S.W.3d at 264 (citations omitted).

## DISCUSSION

"'[A] reviewing court must have sufficient information regarding the agency action to determine whether the action comports with the law and to avoid substituting its judgment for that of the administrative tribunal.'"[11] ***Macon v. Shelby Cty. Gov't Civ. Serv. Merit Bd.***, 309 S.W.3d 504, 511 (Tenn. Ct. App. 2009) (quoting ***Cty. of Shelby v. Tompkins***, 241 S.W.3d 500, 504 (Tenn. Ct. App. 2007)); *see also* ***Miller***, 271 S.W.3d at 664 (noting that we must "determine whether the commission has identified the appropriate legal principles applicable to the case"). We are unable to proceed in our review here because we are missing necessary information.

First, we note that it is not clear whether Appellant's termination and the Board's subsequent decision were based solely on the McCloud incident, or if this incident was considered in conjunction with Appellant's disciplinary history. Greeneville seems to take both positions on this question: (1) that the McCloud incident alone was sufficient to warrant termination, even without considering the past disciplinary history, and (2) that Appellant's past disciplinary history also contributed to the termination decision. The Board, however, appears to lean towards the former position. In its trial brief, the Board

---

[11] Home rule jurisdictions are not bound to follow the UAPA contested case procedures, Tenn. Code Ann. § 27-9-114(a)(2), which require administrative agencies to include findings of fact and conclusions of law in their final orders, Tenn. Code Ann. § 4-5-314(c). The rule set forth in the ***Macon*** Opinion, above, applies even to home rule jurisdictions. *See* ***Macon***, 309 S.W.3d at 511 (applying this rule despite the fact that "Shelby County is a home rule jurisdiction"). Neither party has made arguments regarding whether Greeneville is a home rule jurisdiction, and thus we will not address this point further.

asserted that it "focused more on the [McCloud incident]" in its deliberations than on Appellant's past issues, and that "[t]here was very little in the Board's deliberations concerning previous occurrences which resulted in discipline. The Board's primary focus was on the occurrence of August 31, 2018." And the Board's final order states that Appellant's "termination was based upon [his] conduct on August 31, 2018 involving [the McCloud incident]," yet goes on to state that GPD recommended termination because of the McCloud incident "in light of [Appellant's] prior disciplinary record." Furthermore, at the hearing, one of the Board Members said, "I don't think [Appellant] was terminated on the other incidents. I think he was terminated on this one thing here [the McCloud incident]." Therefore, the bases for Greeneville's and the Board's decisions are unclear.

Our inability to determine which incidents the Board relied on in making its disciplinary decision complicates our review, as we have little else in the record to illuminate the Board's decision that termination was appropriate. Importantly, the record does not contain the standard of review that the Board was to apply to Greeneville's decision to fire Appellant, or the burden of proof at the Board hearing. Counsel for Greeneville explained during the Board hearing that Appellant had the burden to prove that his termination was either politically-motivated or done in bad faith, without cause. Counsel for the Board seemed to confirm that the Board was charged with deciding if Appellant's termination was done for a political reason or in bad faith without cause—but he also framed the question as whether the termination was done in good faith with cause. Other civil service merit board schemes often require only that there be "just cause" to terminate an individual's employment. *See, e.g.*, ***Davis***, 278 S.W.3d at 265 n.19 ("One of the express provisions of the Civil Service Merit Act [a Private Act applicable to Shelby County only] is that employees may only be terminated for just cause.") (citing 1971 Tenn. Priv. Acts ch. 110, § 1, 22) ("There is hereby established a Civil Service Merit System for employees of Shelby County.")); ***Case v. Shelby Cty. Civ. Serv. Merit Bd.***, 98 S.W.3d 167, 175 (Tenn. Ct. App. 2002) ("The issue to be decided by the Board was whether there was just cause to terminate Mr. Case's employment."). But argument by counsel is simply not evidence. *See* ***Greer v. City of Memphis***, 356 S.W.3d 917, 923 (Tenn. Ct. App. 2010) (citations omitted)("[T]he arguments of counsel and the recitation of facts contained in a brief, or a similar pleading, are not evidence. The same is true of statements made by counsel during the course of a hearing, trial, or argument in this Court."). Thus, we have nothing in this record to illuminate the proper standard to be employed by the Board in its decision-making.

The question of which party bore the burden is also unclear. Appellant frames his issue on appeal as if Greeneville had the burden to prove that he was subject to dismissal. The Board and Greeneville, of course, place the burden on Appellant. In other civil service merit board decision cases, however, we have held that the governing policies placed the burden initially on the employer. *See, e.g.*, ***Kirkwood v. Shelby Cty. Gov't***, No. W2005-00769-COA-R9-CV, 2006 WL 889184, at *6 (Tenn. Ct. App. Apr. 6, 2006) ("There only exist[s] the burden of going forward and establishing a prima facie case against

the employee, which Shelby County successfully met in the present case."); **Case**, 98 S.W.3d at 175–76 (citation omitted) ("Although the burden of demonstrating cause is on the employer, the administrative board reviewing the termination must consider the record as a whole to determine whether cause exists."). The question of which party bears the burden of proof is sometimes a difficult one that can have significant consequences. *See generally* **Tennessee Dep't of Correction v. Pressley**, 528 S.W.3d 506, 509 (Tenn. 2017) (involving the question of which party bore the burden in a case involving the termination of an employee under the Tennessee Excellence, Accountability, and Management Act of 2012). There are some token references in the record to the laws that appear to govern the procedure in a case like this, but without more detail, we are unable to draw any conclusions as to the proper procedure that applies before the Board. Instead, while it is clear that Appellant bears the burden in this Court, we are simply left to guess at who bore the burden of proof and what that burden required in the initial Board proceeding.[12]

The hurdle created by these omissions could possibly be scaled if we had additional information concerning GPD's or Greeneville's disciplinary policies from which we could determine the parameters of Appellant's duties and violations thereof, and thus whether termination was an appropriate disciplinary action. In a recent similar case, a police officer with the Metro Nashville Police Department ("MNPD") was terminated for failing a drug screen, which apparently violated certain of MNPD's policies. The officer argued that the first step in the three-step analysis had not been followed—i.e., the appropriate applicable

---

[12] As an example of what is missing in this case, consider the burden of proof on the City of Memphis and standard applied by the City of Memphis's Civil Service Commission, which were considered in a similar case before this Court:

> Section 246 of the Charter of the City of Memphis provides that '[t]he City may terminate, suspend, or demote an employee for just cause, and the employee shall be given a written notice of the reasons for the action taken.' Charter of City of Memphis § 246. Moreover, when an employee appeals to the Civil Service Commission for a review of disciplinary action, section 248 provides that 'the burden of proof required to sustain the action of the city shall be by a preponderance of the evidence. If, after a presentation of the proof, the commission finds that there exists a reasonable basis for the disciplinary action taken, the action of the City shall be sustained.' Charter of City of Memphis § 248. In this case, the Civil Service Commission was required to determine whether the City had shown, by a preponderance of the evidence, a reasonable basis for its decision to terminate the employment of Officers Hearns, Gray, Branch, and Jones. . . . In order to prevail in the proceeding before the Civil Service Commission, the City must have shown by a preponderance of the evidence that the officers violated DR–104 and that the violation, in addition to surrounding circumstances, furnished a reasonable basis to terminate their employment. . . . [W]e must determine whether the Commission's decision was arbitrary or capricious or whether it lacked sufficient evidentiary support.

*City of Memphis v. Civ. Serv. Comm'n of City of Memphis*, 238 S.W.3d 238, 243–44 (Tenn. Ct. App. 2007) (internal parentheticals omitted). Nothing similar is included in the record on appeal here.

legal principles had not been identified. *See Miller*, 271 S.W.3d at 664. We rejected this argument

> because without question, the Commission (as well as the trial court) identified the appropriate program provisions that applied to [the officer's] disciplinary proceeding. At every stage of appeal, the relevant provisions of the MNPD Policy, such as section 2.10.100, which undoubtedly applies given the nature of the charge, as well as section 2.10.040, which [the officer] urged should have been applied, were analyzed. Upon a thorough review of the record, we determine that every tribunal that considered the charges and the discipline against [the officer] correctly identified the appropriate legal principles in play as set forth in the MNPD Policy.

*Metro. Gov't of Nashville & Davidson Cty. v. Civ. Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cty.*, No. M2019-01587-COA-R3-CV, 2020 WL 7388070, at *4 (Tenn. Ct. App. Dec. 16, 2020). Additionally, "[w]e note[d] that the applicable MNPD Policy regulations [we]re included in the administrative record presented to the [trial court] and to this Court on appeal." *Id.*[13]

Unfortunately, the record in this case does not contain similar proof. The termination notice provided to Appellant by GPD merely stated that he was being terminated based on the charges of "1.1 Employees Responsibilities" and "2.4 Attentiveness to Duty," coupled with his disciplinary history. However, the termination notice did not define the policies alleged to have been violated. The only proof in the record regarding the charges is two pages titled "Greeneville Police Discipline Matrix," which appear on two pages of a fifteen-page document entitled "4.03 Disciplinary Policy." According to the discipline matrix, for the charge of "1.1 Employee's Responsibilities," the punishment for the first offense is a "[w]ritten reprimand, up to and including 3 days SWOP,"[14] punishment for the second offense is "[n]ot less than 4 days, up to and including 15 days SWOP," and punishment for the third offense is "[n]ot less than 16 days, up to and including 30 days SWOP." Under the headings for the second and third offenses, it states, "(penalty dependent upon prior violation)." As for "2.4 Attentiveness to Duty," the punishment for the first offense is "[w]ritten reprimand, up to and including 3 days SWOP," the punishment for the second offense is "[n]ot less than 4 days, up to and including 30 days SWOP," and punishment for the third offense is "[n]ot less than 30 days, up to and including 30 days SWOP." Again, it states, "(penalty dependent upon prior

---

[13] In one Tennessee Supreme Court case, the policies that a police officer was apparently terminated for violating (by failing a drug test) were not in the record. However, the officer's attorney "agreed . . . that if the Court [found] that the positive urine specimen test result was admissible then the Board's decision was neither arbitrary nor capricious and was supported by substantial and material evidence." *Davis*, 278 S.W.3d at 257 n.1, 264, 265. Here, there is no similar stipulation which might obviate the need to be able to locate the policies that allegedly warranted Appellant's termination in the record.

[14] Although not defined, our best guess is that "SWOP" means "suspension without pay."

violation)" under the headings for the second and third offenses. Termination is not listed as a punishment under either charge, even after multiple violations. In contrast, termination is listed as a punishment for other charges on the discipline matrix. For example, for charge "2.24 Sexual Misconduct," the punishment for the first offense is "Not less than 3 days, up to and including dismissal (depending on the severity of the offense)," and punishment for the second offense is simply, "Dismissal."

Absent from the record, however, are the other thirteen pages of the disciplinary policy. We can only guess that these pages may have defined what was required to meet "1.1 Employee's Responsibilities" or "2.4 Attentiveness to Duty." In any event, neither of these requirements are in any way elucidated in this record. There was no testimony at the Board hearing regarding GPD's "4.03 Disciplinary Policy,"[15] the discipline matrix, or the specific charges Appellant faced (1.1 and 2.4). The only witnesses who testified under oath were Appellant and Ms. Jones. The Board members asked Chief Ward and Assistant Chief Crum some questions at the hearing, but neither of them was placed under oath, while Appellant and Ms. Jones were placed under oath. Thus, it is unclear whether their responses may even properly be considered proof. Even if their answers can be considered, however, they did not testify specifically to GPD's or Greeneville's disciplinary policies and procedures—rather, they only briefly and vaguely spoke to how they would have handled the Mr. McCloud incident and how Appellant mishandled it. In fact, the only detailed testimony regarding policies and procedures was from Appellant. And he essentially testified to the effect that, for the most part, he had not received specialized training and there were not policies in effect that mandated he act in a manner different from how he acted, and that the McCloud incident required him to exercise his discretion.

Granted, the record contains pieces of documentary evidence relating to Appellant's other disciplinary incidents, but those, too, do not include explanations of the specific policies Appellant was charged with violating. For example, various reprimands Appellant received warned him "that further violations of the rules and regulations may result in harsher disciplinary action that may include suspension or termination." One such reprimand, related to the jail incident states, in part, that Appellant violated "Rule 2.8 UNBECOMING CONDUCT of the Department's Rules and Regulations," but, again, nowhere in the record is this rule specifically defined. Other examples include emails he

---

[15] It further appears that Disciplinary Policy 4.03 is part of a larger document that at one point in the record is referred to as a handbook. This document, or an entirely separate one, contains a grievance process that Appellant utilized with regard to his earlier incidents. Handbooks are often referenced by this Court in determining the propriety of civil service merit board decisions. *See, e.g.*, **Shaw v. Shelby Cty. Gov't**, 189 S.W.3d 232, 238 (Tenn. Ct. App. 2005) (discussing how the employee handbook addressed layoffs and reductions in staff). Provisions of the Greeneville Charter are also mentioned in the administrative record. Charters are also referenced by this Court as providing guidance in these types of decisions. *See, e.g.*, **Haynes v. Knoxville Utilities Bd.**, 1993 WL 104639, at *3 (Tenn. Ct. App. Apr. 8, 1993) (discussing the Knoxville Charter). Again, none of these documents is included in the record on appeal. *See generally* Tenn. R. Evid. 202(b) (governing non-mandatory judicial notice of, inter alia, "ordinances of municipalities").

received with various instructions, such as the one from Assistant Chief Crum instructing him to enter calls into the CAD and dispatch as soon as possible. While these portions of the record demonstrate that Appellant was given various instructions and discipline throughout his employment with GPD, they do not sufficiently illuminate the specific legal policies Appellant was obligated to follow, and the punishment he faced if he did not.

What we are left with in determining whether the Board identified and applied the proper legal principles, then, is solely the discipline matrix. While the Board's final order states that the Board considered "the entire record," nowhere in the Board's deliberations, which were conducted on the record, do the Board members mention this matrix or otherwise discuss the definitions of the charges against Appellant. Moreover, the matrix, standing alone, does not support Greeneville's or the Board's actions, as it does not expressly authorize termination for violations of either 1.1 or 2.4, however defined. Thus, even if we were to conclude, for example, that there was substantial and material evidence that Appellant violated the specific mandate that he "[e]nter all calls into the CAD and dispatch as soon as possible," we still are still left with little guidance as to how this violation makes Appellant subject to dismissal, given that the discipline matrix does not authorize this result.

Greeneville asserts, however, that the discipline matrix cannot be considered in isolation, as it does not explain if, when, and how progressive discipline applies, or even if the matrix is mandatory or advisory. Thus, Greeneville essentially admits that the record before the Board is missing crucial information. But Greeneville asserts that the failure to submit this information to the Board should be blamed on Appellant. As previously discussed, however, without knowing the laws that govern the procedure in this case, we cannot even determine which party bore the burden to present evidence before the Board. If Greeneville, as the employer, bore the burden, it seems self-evident that it would be required to present evidence as to what policies Appellant violated and which policies provide that termination was an appropriate remedy under these circumstances. And even if the burden fell on Appellant, it appears that if Greeneville desired to show that the discipline matrix alone was not sufficient to determine the appropriate discipline, it was Greeneville's responsibility to put forth the policies that it asserted were also relevant to that determination.

In many cases, meaningful appellate review is not possible because we are unable to determine the basis for the board or agency's decision. *See Swift Roofing, Inc. v. State*, No. M2010-02544-COA-R3-CV, 2011 WL 2732263, at *6 (Tenn. Ct. App. July 13, 2011) (collecting cases). That is not the case here. Instead, the deficiency here results from the omission of the very policies that guide the Board's decision-making, which do not appear to have been presented in full to either the Board, the trial court, or this Court. Without this information, we are "left to speculate" as to whether the Board's decision properly comports with the relevant legal policies. *Id.* at *7. Furthermore, we are unable to determine that either party is solely responsible for the failures in this case. Under these

circumstances, we believe that the best remedy is to vacate the decision and remand this matter to the Board for reconsideration of Appellant's dismissal in light of all the applicable legal and disciplinary policies, as well as the discipline matrix. *See* **Smith v. Amerisure Ins. Co.**, No. 03A01-9406-CV-00223, 1994 WL 679066, at \*1 (Tenn. Ct. App. Dec. 5, 1994) ("We have made a thorough review of the record and are of the opinion complete justice cannot be had by reason of defects in the record. Material issues evolve around the provisions of the policy of insurance. The insurance policy, however, is not in the record. The record fails to show the policy was filed as an exhibit and cannot be reached pursuant to [] Rule 24(e) [of the Tennessee Rules of Appellate Procedure]. The case is remanded pursuant to T.C.A. § 27-3-128."[16]). Upon remand, the Board may, in its discretion, hear additional evidence from the parties.

## CONCLUSION

The judgment of the Chancery Court of Greene County is vacated and remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant David Thacker and one-half to Appellees the Town of Greeneville and the Town of Greeneville Civil Service Board, for which execution may issue if necessary.

<u>s/ J. Steven Stafford</u>
J. STEVEN STAFFORD, JUDGE

---

[16] Tennessee Code Annotated section 27-3-128 provides:

> The court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the objects of the order, and upon such terms as may be deemed right.

- 13 -